**State of NEW YORK by Eliot SPITZER, Attorney General, Plaintiff,**

v.

**SAINT FRANCIS HOSPITAL, Vassar Brothers Hospital and Mid–Hudson Health, Defendants.**

**No. 98 Civ. 0939(WCC).**

United States District Court, S.D. New York.

April 10, 2000.

Eliot Spitzer, Attorney General of State of New York, New York City (Harry First, Bureau Chief, Antitrust Bureau, Susan E. Raitt, Robert L. Hubbard, Gary Weinstein, Asst. Attorneys General, Antitrust Bureau, Matt Siegel, Jody Boudreault, James Yoon, Chris DeSantis, Abe Laks, Samuel Brooks, Interns, Antitrust Bureau, of counsel), for Plaintiff.

Bleakley Platt & Schmidt, White Plains, NY (William F. Harrington, Mary Ann Wirth, of counsel), Buchanan Ingersoll Professional Corp., Pittsburgh, PA (Wendelynne J. Newton, Joy Flowers Conti, James M. Evans, of counsel), for Defendant Saint Francis Hosp.

Winston & Strawn, New York City (Robert S. Fischler, of counsel), Winston & Strawn, Chicago, IL (R. Mark McCareins, Jeffrey A. Leon, Nicole J. Ottmer, Brooke B. Holley, of counsel), Garfunkel, Wild & Travis, P.C., Great Neck, NY (Robert Andrew Wild, Roy Breitenbach, of counsel), for Defendants Vassar Brothers Hosp. and Mid–Hudson Health.

## OPINION AND ORDER

WILLIAM C. CONNER, Senior District Judge.

The State of New York (the "State"), by Attorney General Eliot Spitzer, brings this civil action pursuant to state and federal antitrust laws against defendants St. Francis Hospital ("St.Francis"), Vassar Brothers Hospital ("Vassar") and Mid–Hudson Health ("Mid–Hudson"). The State claims that St. Francis and Vassar, through their agent Mid–Hudson, fixed the rates, terms and conditions for services provided at defendant hospitals and that defendant hospitals wrongfully divided the market for the provision of various services between them, in violation of Section One of the Sherman Act, 15 U.S.C. § 1, and the Donnelly Act, N.Y.Gen.Bus.Law, Art. 22,

§§ 340–47. The State seeks injunctive relief, civil penalties of up to one million dollars per violation pursuant to Section 342–a of the Donnelly Act, N.Y.Gen Bus. Law, Art. 22, attorneys' fees and costs of suit.

In April 1999, defendants filed a motion to dismiss the State's complaint under Fed.R.Civ.P. 12(b)(6), which was converted to a motion for summary judgment pursuant to Fed.R.Civ.P. 56 in June 1999. On September 8, 1999, the State filed a cross motion for summary judgment seeking a determination that defendants' alleged activities are illegal per se and that defendants are not entitled to state-action immunity. On September 27, 1999, defendants filed an expanded motion for summary judgment asking this Court to rule: (1) that the defendants are entitled to state-action immunity; (2) that defendants' activities are not illegal per se and must be evaluated pursuant to the Rule of Reason; (3) that the State is estopped from bringing this lawsuit; (4) that the State's market allocation claim is time-barred; and (5) that the State has failed to demonstrate antitrust injury. For the reasons that follow, the State's motion for summary judgment is granted and defendants' motion for summary judgment is denied.

## BACKGROUND

Defendants Vassar and St. Francis are both not-for-profit hospital corporations organized and existing under the laws of the State of New York. Prior to the establishment of Mid–Hudson, they were the only hospitals in Poughkeepsie, New York.[1] St. Francis, a 295–bed hospital with more than 2,100 employees, is affiliated with the Roman Catholic Church and must comply with the Ethical and Religious Directive for Catholic Health Care Facilities approved by the Archdiocese of New York. Vassar, a 315–bed hospital with more than 1,200 employees, is not church-affiliated.

The hospitals have different bond financing sources which cannot be commingled.

In the 1980s, the hospitals began to experience financial difficulties resulting from increased competition from neighboring hospitals. In an internal memorandum regarding the defendants' application to establish Mid–Hudson, the state Department of Health (the "DOH") found that services in the two hospitals began to deteriorate in the mid to late–1980s: "Problems common to both institutions began to surface, such as reduced quality of care, increasing patient out-migration, duplication of certain services and support areas, market share shifts, competition for scarce skilled professional staff, and operating losses which hindered investment in aging physical plants and new technologies." (McCareins Decl., Ex. 4 at NYAG 539.)

The DOH oversees the establishment and construction of hospitals in New York State pursuant to Article 28 of the Public Health Law and issues operating certificates specifying the kinds of services the facilities are authorized to provide. Hospitals that want to add a service or project with capital costs of more than $3 million must apply to the DOH for construction approval through the Certificate of Need ("CON") process. The CON process must also be followed in seeking DOH approval for the establishment of a new hospital corporation via the DOH's Public Health Council. N.Y.Pub.Health Law § 2801–a(1).

To obtain approval from the Public Health Council, a facility must go through a three-step process. First, the facility submits an application for approval of its proposed certificate of incorporation to the Public Health Council. N.Y.Pub.Health Law § 2801–a(2). The Council then forwards the certificate and other supporting documents to the state hospital review and planning council and the health systems

---

1. Defendants assert that Mid–Hudson is an Article 28 hospital. The State disagrees. Records show that the State Department of Health recognized the defendants' application to establish Mid–Hudson as an application to establish "a new Article 28 hospital," (McCareins Decl., Ex. 4), but Mid–Hudson has no physical plant of its own.

agency that has geographical jurisdiction of the area where the proposed hospital is to be located, in this case, the Hudson Valley Health Systems Agency, Inc. *See id.* The state hospital review and planning council and the health systems agency then offer their recommendations to the Public Health Council. *Id.*

In 1988 St. Francis and Vassar each independently sought DOH approval for a CON to operate a cardiac catheterization laboratory at their respective hospitals. On January 6, 1989, the DOH denied both requests, recommending instead that the hospitals devise a plan to implement the laboratory jointly at the site of one of the hospitals. (McCareins Decl., Ex. 14 at NYAG 555.) In 1992, the hospitals sought DOH approval of CONs to provide three new services jointly. These services were: (1) a free-standing diagnostic cardiac catheterization program for adults at Vassar; (2) a fixed-site Magnetic Resonance Imaging ("MRI") unit at St. Francis; and (3) a mobile lithotripsy unit at St. Francis.

At the same time, the hospitals sought approval from the Public Health Council to establish a joint venture, an Article 28 hospital, Mid–Hudson Medical Center (the name was subsequently changed to Mid–Hudson Health). (*Id.,* Ex. 14 at NYAG 557.) Mid–Hudson proposed to "have no physical facility or staff of its own" but instead would be "empowered with shared operational and management authority for new clinical services for each of the sponsoring hospitals." (*Id.,* Ex. 16 at NYAG 2978.) On October 7, 1994, Mid–Hudson's application was approved. (Murphy Aff., Ex. B.) Mid–Hudson was issued an operating certificate pursuant to Article 28 of the Public Health Law for adult cardiac catheterization, a lithotripter, and MRI. (*Id.,* Ex. C.)

Defendants claim that the DOH contemplated that the Mid–Hudson joint venture would extend collaboration by the two hospitals beyond the three new services. The State denies this, and it is this further collaboration the State now challenges.

Defendants offer the testimony of Raymond D. Sweeney, who served as director of the Office of Health Systems Management for the DOH for twelve years, to support their argument that further collaboration was envisioned and approved by the DOH. Sweeney states that the goal of the DOH "was to actively encourage as much collaboration between the hospitals as possible, and our encouragement and approval of the Hospitals' joint activities was not conditioned on any type of merger." (Sweeney Aff. ¶ 10.) Sweeney also states:

> Although the Mid–Hudson plan originally focused on three services ... it was intended to go beyond these three services to effectively eliminate competition between the hospitals. The Department of Health's acknowledgment of that fact is clearly demonstrated by our approval of the Fairness Formula, which was intended to maintain an economic balance between the hospitals and ensure that neither hospital would be adversely affected by Mid–Hudson, including by allocation and siting of services at one or the other of the hospital campuses. I was aware of the intent to make "trades", and that the Fairness Formula was designed to eliminate the incentive for the Hospitals to compete against one another in the provision of services or on the price that those services would be offered.

(*Id.* ¶ 14.)

Defendants further point to the CON application itself in which the hospitals state that they sought to "maintain[ ] the existing specialized services" and "eliminate[ ] unnecessary service duplication." [2] (McCareins Decl., Ex. 16 at NYAG 2986.) In the CON application, defendants state

---

2. Defendants also cite minutes prepared by defendants of meetings between the hospitals and the DOH which report that division of services between the hospitals was discussed.

However, to the extent that these minutes record defendants' own statements, they are self-serving hearsay and can be accorded no weight.

that Mid–Hudson's board would have the responsibility of "assuring fairness to each hospital through adoption of a 'fairness formula'—a doctrine that guarantees each hospital a fair share in the financial losses and gains resulting from alterations in services." (*Id.*, Ex. 8 at NYAG 826–27.) The application states that Mid–Hudson "will strive to maintain the necessary inpatient and outpatient activity levels at St. Francis and Vassar Brothers Hospital (currently ⁴⁰⁄₀₀ market-share split respectively) to ensure balanced financial performance." (*Id.* at NYAG 829.)

Defendants' "Fairness Formula" is a revenue/market share-oriented model that allocates revenue between the hospitals while at the same time recognizing that there are variable costs associated with the provision of services. In addition to variable costs, the model also accounts for any special investments for a "Center of Excellence." Once gross revenue at each hospital is calculated for each applicable service, it is reduced by the variable cost assumption as well as by any depreciation for capital acquisitions, costs and advertising expenses for Centers of Excellence. The amount of net market share is compared to the base year of 1991 to determine whether any imbalance exists. Defendants agreed to ask physicians who had privileges at each hospital to redirect patients from the advantaged hospital to the disadvantaged hospital to help keep defendants' market shares roughly fixed at their 1991 levels. (Pl.Rule 56.1 Stmt., Ex. 6 at 301–02.) However, defendants' attempt to redirect admissions was ineffective due to the fact that medical admissions frequently go through the emergency room, and thus the hospital to which a patient was admitted was a "patient-driven decision as opposed to a physician-driven decision." (*Id.* at 301–302.)

The "trades" are an allocation of services between defendant hospitals. Marianne L. Muise, vice president of finance and administrative services for St. Francis, states that "[t]he trades were a balancing formula" pursuant to which the hospitals agreed not to compete against one another. (McCareins Decl., Ex. 18 at 155, 192–93.) The "trades" are set forth in an undated document which shows specialties divided between the two hospitals. (*Id.*, Ex. 28.) Once a hospital reached a "certain criteria level of expertise, high technology, it would be classified as a Center of Excellence." (*Id.*, Ex. 18 at 193.) Vassar's campus is the designated site for the cardiac catheterization laboratory and the cardiology center; obstetrics; the predominant site for gynecology; cancer admissions dependent on high technology; fifty percent of general surgery; and the medical pediatrics unit. St. Francis is designated for selected cancer admissions not dependent upon high technology; orthopedics/neurology; MRI; mobile lithotripsy; the predominant site for ambulatory surgery and the laser center; the predominant diagnostic outpatient center; plastic surgery; fifty-percent of general surgery; an expanded emergency room, trauma II; and a guaranteed percentage of the market share of medical admissions. (*Id.*) The State admits in its Amended Objections and Responses to Defendants' Requests for Admissions that "at some point representatives of DOH looked at this 'trades' document, and did not object to it." (*Id.*, Ex. 13 at 4.) However, the "trades" document was not included in defendants' CON application for the establishment of Mid–Hudson.

In January 1995, defendants entered into an agreement (the "1995 Agreement") in which the parties state that:

> [Vassar] and [St. Francis] originally caused [Mid–Hudson] to be formed to carry out the intent of [Vassar] and [St. Francis] to jointly own and operate, directly or indirectly, and to delegate to [Mid–Hudson] direct control of the three clinical services described in the original Certificate of Need application.... Since that time the parties have deemed it in their best interests to expand the delegation of authority to [Mid–Hudson] in order to more closely integrate Vassar Brothers and St. Francis to carry on

further activities to eliminate costly duplication of services....

(Pl.Rule 56.1 Stmt., Ex. 5 at 1.)

Defendants agreed not to compete with Mid–Hudson, nor with one another, for the provision of "the same or substantially similar services." (*Id.* at 2.) The 1995 Agreement also states that the hospitals will "unify substantially all hospital operations, including creating a single parent board, merging medical staffs into [Mid–Hudson], combining development and control over clinical services and integrating administrative services." (*Id.*) Despite the 1995 Agreement, Defendants state that the hospitals continue to duplicate some services. For example, Vassar continues to provide orthopedic surgery, although "they're not investing in the resources to bring it to a different level of service as St. Francis is...." (McCareins Decl., Ex. 18 at 195.) Muise states in her deposition that the hospitals have not to this date substantially unified their operations, created a single parent board, nor merged their medical staffs. (Pl.Rule 56.1 Stmt., Ex. 6 at 355–57.)

Defendants expressly told the DOH that they were not merging. In the establishment CON application, defendants state that "[e]ach hospital will remain a financially independent structure and will retain all governance responsibilities not specifically given to the new corporation." (Murphy Aff., Ex. A at NYAG 827.) The State claims that the hospitals' plan as submitted to the DOH called for the hospitals to delegate to Mid–Hudson authority only for the three new services and for future planning and CON submissions. (*See id.* at NYAG 828–29.) The State contends that "[t]he hospitals were to remain separate with no formal linkage except for the new services established under the new company." (*Id.* ¶¶ 16–22.) The State claims that the DOH did not contemplate that the hospitals would negotiate jointly with third-party payers regarding contract terms and prices for hospital services. (*Id.* ¶¶ 46–47, Ex. M.) In addition, the State claims defendants explicitly stated that each hospital's billing and reimbursement for the jointly operated services would be kept separate. (*Id.* ¶ 45, Ex. A at NYAG 833.)

Prior to health care deregulation on January 1, 1997, rates for health maintenance organizations ("HMOs") were pervasively regulated by the State of New York. HMOs were permitted to negotiate some rates subject to State approval prior to the formation of Mid–Hudson, but they rarely exercised that power. During the course of the establishment of Mid–Hudson, the State was regulating prices related to reimbursement rates for HMOs; thus joint negotiation with HMOs was not an issue defendants discussed with the DOH. However, prior to deregulation, on October 2, 1996, a DOH attorney wrote to Mid–Hudson that while the Mid–Hudson CON application did not expressly contemplate joint negotiation with third-party payers for services outside the three services for which Mid–Hudson was certified, "it was implicit in the proposal that upon the establishment of [Mid–Hudson], competition between the sponsoring hospitals would be substantially lessened. Furthermore, given that the establishment of [Mid–Hudson] was represented and accepted as the precursor to further merging of services and activities, it would appear that joint negotiations of rates is a logical step to achieving those ends." (McCareins Decl., Ex. 24 at 2.)

The Health Care Reform Act of 1996 (the "Act") replaced DOH regulation of hospital rates for most third-party payers with a competitive system. As the health care market in New York became deregulated, defendants began jointly negotiating contracts and rates for all services except those proscribed by the Catholic Church and minor services offered by the hospitals' affiliates with managed care companies through Mid–Hudson. Marianne Muise was appointed the chief negotiator for Mid–Hudson.

The State claims that in late 1996 or early 1997, the DOH was advised by a third-party payer that the hospitals insist-

ed on joint negotiations. In a January 1997 letter to a third-party payer, Mohawk Valley Physician's Health Plan ("MVP"), DOH Executive Deputy Commissioner Dennis Whalen states that "records pertaining to the creation of [Mid–Hudson] indicate that the Public Health Council's approval did not contemplate the new entity negotiating on behalf of both hospitals for the full array of services MVP seeks to make available to subscribers." (Murphy Aff., Ex. M.) At least two of the largest third-party payers in the region have complained about joint negotiation, stating that they want to bargain with the hospitals independently. The hospitals have refused their request and continue to negotiate jointly.

In the CON application for the establishment of Mid–Hudson, defendants state that they plan to apply for full review CONs through the new entity unless the projects are needed to maintain existing programs or services or are needed for general maintenance purposes. The only CONs submitted by Mid–Hudson are: (1) the CON to establish Mid–Hudson and oversee the three initial services, MRI, lithotripsy and cardiac catheterization; (2) a CON to be certified as a co-operator of an outpatient cancer center at Vassar Brothers, which was withdrawn and submitted by Vassar alone; and (3) a CON to certify the cardiac surgery service at Vassar Brothers. In 1996, the Public Health Council approved Mid–Hudson and Vassar to provide cardiac surgery, with an approved capital cost of almost seventeen million dollars.

The hospitals have sought individual approvals from the DOH for various items, although defendants claim that all CON applications are discussed and approved by Mid–Hudson prior to filing. Vassar has applied for CONs to construct: (1) an extension clinic for ambulatory surgery in Fishkill; (2) an outpatient radiation therapy clinic in Fishkill; (3) an outpatient cancer center on its campus; and (4) an electrophysiology laboratory on its campus. Vassar, in conjunction with another hospital, not St. Francis, completed a one mil-

lion-dollar clinic in Kingston and has entered into a joint venture agreement with Northern Dutchess Community Hospital. St. Francis has applied for more than twenty CONs on its own since filing the Mid–Hudson establishment CON.

## DISCUSSION

### I. *Summary Judgment Standards*

Rule 56(c) provides that the court may grant summary judgment where there are no genuine issues of material fact for trial. Fed.R.Civ.P. 56(c). If there are no genuine issues, the movant is entitled to judgment as a matter of law. "An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Agritronics Corp. v. National Dairy Herd Ass'n,* 914 F.Supp. 814, 820 (N.D.N.Y.1996). On cross-motions for summary judgment, the standard is the same as that for individual motions. In evaluating each motion, the court must look at the facts in the light most favorable to the non-moving party. *Aviall, Inc. v. Ryder Sys., Inc.,* 913 F.Supp. 826, 828 (S.D.N.Y.1996). "Simply because the parties have cross-moved, and therefore have implicitly agreed that no material issues of fact exist, does not mean that the court must join in that agreement and grant judgment as a matter of the law for one side or the other. The court may conclude that material issues of fact do exist and deny both motions." *Id.* (internal citation omitted). The Second Circuit has recognized that summary judgment is a "vital procedural tool to avoid wasteful trials and may be particularly important in antitrust litigation to prevent lengthy and drawn-out litigation that has a chilling effect on competitive market forces." *Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.,* 996 F.2d 537 (2d Cir.1993), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993).

Here, the State does not challenge the formation of Mid–Hudson or the siting of the three services, a free-standing diagnostic cardiac catheterization program for

adults at Vassar, a fixed-site MRI unit at St. Francis, and a mobile lithotripsy unit at St. Francis. Rather, the State seeks to enjoin defendants from jointly negotiating contracts with third-party payers and from continuing to allocate the market for services among themselves. (Compl.¶ 4.) At this stage in the litigation, the parties' cross-motions for summary judgment relate only to the issue of liability and defendants' affirmative defense of state action immunity.

## II. *State–Action Immunity*

■ Defendants claim that the State's lawsuit is barred by the doctrine of state-action immunity as enunciated by the Supreme Court in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). There, the Supreme Court found that an anticompetitive marketing program which "derived its authority and its efficacy from the legislative command of the state" did not violate the Sherman Act because the Act was promulgated to regulate private action, not to prohibit a state from imposing restraints on competition as an act of government. 317 U.S. at 350–52, 63 S.Ct. at 313–14. The Supreme Court has articulated a two-part test for determining whether there is state-action immunity for anticompetitive activity. First, the challenged restraint must be "one clearly articulated and affirmatively expressed as state policy." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 100 S.Ct. 937, 943 (1980) (internal citations and quotations omitted) (*"Midcal"*). Second, the policy must be "actively supervised" by the State itself. *Id.*

### A. *The First Prong of the Midcal Test*

■ The first prong of the *Midcal* test was further refined by the Supreme Court in *Southern Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985). In *Southern Motor Carriers*, the United States challenged the collective ratemaking of motor common carriers operating through private rate bureaus, which was

authorized, but not compelled, by the states in which the rate bureaus operated. *See* 471 U.S. at 50, 105 S.Ct. at 1723. The Court held that "a state policy that expressly permits, but does not compel, anticompetitive conduct may be 'clearly articulated' within the meaning of Midcal." 471 U.S. at 61, 105 S.Ct. at 1729. The Court ruled that "[a] private party acting pursuant to an anticompetitive regulatory program need not point to a specific, detailed legislative authorization for its challenged conduct." 471 U.S. at 64, 105 S.Ct. at 1730 (internal quotations and citations omitted). Rather, "[a]s long as the State as sovereign clearly intends to displace competition in a particular field with a regulatory structure, the first prong of the Midcal test is satisfied." *Id.*

In *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the Supreme Court ruled in the case of a municipality charged with anticompetitive conduct that the municipality was entitled to state-action immunity because its conduct was "a foreseeable result" of state legislation. *See* 471 U.S. at 42, 105 S.Ct. at 1718; *see also City of Columbia v. Omni Outdoor Advertising, Inc.*, 499 U.S. 365, 373, 111 S.Ct. 1344, 1350, 113 L.Ed.2d 382 (1991) (holding municipality entitled to state-action immunity where "suppression of competition is the 'foreseeable result' of what the statute authorizes"); *Cine 42nd Street Theater Corp. v. Nederlander Org., Inc.*, 790 F.2d 1032, 1043 (2d Cir.1986) ("When the challenged actor is a private party, both foreseeability and supervision must be demonstrated.").

Prior to January 1, 1997, New York subjected its hospitals to pervasive regulation, including setting rates for HMOs. HMOs were permitted to negotiate some rates subject to State approval, but rarely exercised that power. The DOH's general counsel described the regulatory atmosphere in 1991 as follows:

> Health care delivery by licensed providers under the Public Health Law is a pervasively regulated industry in New

York State. New York has clearly determined that the public interest is best served not by free competition but by a comprehensive health planning program, certificate of need law and a comprehensive reimbursement system. State involvement is clear and active. Government has acted to substitute regulation for the ideal of free competition in the exercise of its police power to assure an appropriate and cost effective health care delivery system.

(McCareins Decl., Ex. 27 at 4.)

The State clearly delegated to the DOH "the central, comprehensive responsibility for the development and administration of the state's policy with respect to hospital and related services." N.Y.Pub. Health Law § 2800 (McKinney 1993). Prior to deregulation, the State had a clearly articulated policy of replacing competition with state regulation. This regulation extended to establishing "schedules of rates, payments, reimbursements, grants and other charges for hospital and health-related services...." N.Y.Pub. Health Law § 2803(2)(a)(ii) (McKinney 1993). The DOH itself foresaw joint negotiations with third-parties at the time Mid–Hudson sought an establishment CON. In 1996 the DOH's general counsel wrote to Mid–Hudson that "given that the establishment of [Mid–Hudson] was represented and accepted as the precursor to further merging of services and activities, it would appear that joint negotiations of rates is a logical step to achieving those ends." (McCareins Decl., Ex. 24 at 2.) Accordingly, defendants have satisfied the first prong of the *Midcal* test as to the State's allegation of price fixing.

As to the State's allegation of market division, defendants have also satisfied the first prong of the *Midcal* test for the time period prior to deregulation. The State heavily regulated the provision of hospital services. Although the "trades" were not expressly approved by the DOH, the State admits that the DOH was at least aware of them and did not object to them. Accordingly, prior to deregulation, market division by defendants was a foreseeable result of DOH approval of the Mid–Hudson establishment CON.

The question now arises whether that result changes for defendants' conduct after passage of the Act in which the legislature adopted legislation that would "promote competition in the health care marketplace by increasing reliance on market incentives while reducing the role of legislation." 1996 N.Y.Laws 639. Although the Second Circuit has not reached this issue, the Ninth Circuit has found that a change in state policy which expressly requires compliance from private actors renders the prior policy irrelevant for state action immunity purposes for the time period after the change. *See California CNG, Inc. v. Southern California Gas Co.,* 96 F.3d 1193, 1201 (9th Cir. 1996). Furthermore, the Supreme Court has stated that "state-action immunity is disfavored, much as are repeals by implication." *F.T.C. v. Ticor Title Ins. Co.,* 504 U.S. 621, 636, 112 S.Ct. 2169, 2178, 119 L.Ed.2d 410 (1992).

The Supreme Court has stated that "[i]f the States must act in the shadow of state-action immunity whenever they enter the realm of economic regulation, then our doctrine will impede their freedom of action, not advance it." 504 U.S. at 635, 112 S.Ct. at 2178. Were we to rule today that a change in state policy has no impact on defendants' immunity, we would blunt the impact of the State's legislation. However, we need not decide this issue, as we find that defendants fail to meet the second prong of the *Midcal* test for their conduct both prior to and after the State initiated health care reform.

**B. *The Second Prong of the Midcal Test***

As previously stated, a private actor must meet both prongs of the *Midcal* test in order to enjoy state-action immunity. *Southern Motor Carriers,* 471 U.S. at 62, 105 S.Ct. at 1729. Thus, in order to claim immunity defendants must show that the anticompetitive policy was "actively super-

vised" by the State. *Midcal,* 445 U.S. at 105, 100 S.Ct. at 943. "[T]he analysis asks whether the State has played a substantial role in determining the specifics of the economic policy. The question is ... whether the anticompetitive scheme is the State's own." *Ticor,* 504 U.S. at 635, 112 S.Ct. at 2177.

The mere potential for state supervision is not enough to grant immunity. 504 U.S. at 638, 112 S.Ct. at 2179. The fact the DOH was regulating hospital prices and reimbursements prior to 1997 and arguably continues to set rates for some patients[3] is insufficient to confer immunity for defendants' joint negotiations with third-party payers, which defendants assert started after health care reform was initiated. (*See* Defs.Mem.Supp.Summ.J. at 1 n. 2.) "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Midcal,* 445 U.S. at 106, 100 S.Ct. at 943.

Far from exercising any control over defendants' joint negotiations, the DOH notified Mid–Hudson by copying Mid-Hudson on a January 1997 letter to MVP that "records pertaining to the creation of [Mid–Hudson] ... indicate that the Public Health Council's approval did not contemplate the new entity negotiating on behalf of both hospitals for the full array of services MVP seeks to make available to its subscribers." (Murphy Aff., Ex. M.) In the Mid–Hudson establishment CON application, defendants expressly provided that "[e]ach hospital will remain a financially independent structure and will retain all governance responsibilities not specifically given to the new corporation." (*Id.,* Ex. A at NYAG 827.) In Mid–Hudson's proposed certificate of incorporation, defendants specified that the jointly-operated services "shall be financed by, billed for and reimbursed to whichever of said Hospitals physically houses and provides each

such service." (*Id.,* Ex. E at NYAG 1209.) Thus, as to defendants' joint negotiations with third-party payers, not only is there a failure of the state to "actively supervise" these activities, but these activities were beyond the scope of the express authority the State granted to Mid–Hudson. (*Id.*)

DOH approval of the Mid–Hudson establishment CON and DOH's failure to object to the "trades" and the "Fairness Formula" does not constitute the kind of "comprehensive, ongoing involvement" that justifies antitrust immunity. *Capital Tel. Co., Inc. v. New York Tel. Co.,* 750 F.2d 1154, 1163 (2d Cir.1984). The "active supervision" prong requires that the State "exercise ultimate control over the challenged anticompetitive conduct." *Patrick v. Burget,* 486 U.S. 94, 101, 108 S.Ct. 1658, 1663, 100 L.Ed.2d 83 (1988), *rehear'g denied,* 487 U.S. 1243, 108 S.Ct. 2921, 101 L.Ed.2d 952 (1988). "The mere presence of some state involvement or monitoring does not suffice." *Id.* Defendants fail to point to any continuing state involvement in their allocation of health care services after the Mid–Hudson establishment CON was approved. *See State of North Carolina ex rel. Edmisten v. P.I.A. Asheville, Inc.,* 740 F.2d 274, 279 (4th Cir.1984), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1865, 85 L.Ed.2d 159 (1985) (finding "active supervision" prong not satisfied where state law did not provide for any state supervision following issuance of a certificate of need). In fact, defendants state that "[n]o 'new' approvals were required" for the "trades", the Fairness Formula, or the Centers of Excellence. (Defs.Mem.Opp.Summ.J. at 22.) Defendants further admit that the State has not reviewed its joint negotiations with third-party payers. (Defs Rule 56.1 Stmt. ¶ 76.) Charles Murphy of the DOH states in his affidavit, "There is no follow-up or any other type of supervision by DOH as to whether any prices jointly negotiated by St. Francis and Vassar

---

**3.** Defendants claim that 40 percent of their rates are still regulated. (Defs.Mem.Supp.Summ.J. at 11 n. 11.) The State counters that Medicaid rates "are the

prices that the government as the purchaser agrees to pay; they are not regulated rates for all hospital services." (Pl.Mem.Opp.Summ.J. at 8.)

Brothers and third party payors are reasonable." (Murphy Aff. ¶ 50.)

The fact Mid–Hudson was created in an environment of pervasive state regulation is insufficient to confer antitrust immunity. The rationale behind requiring the second prong of the *Midcal* test for private actors while municipalities and other subsections of the State do not have to meet this test is that "[w]here a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State." *Hallie*, 471 U.S. at 47, 105 S.Ct. at 1720. The State has determined to "promote competition in the health care marketplace by increasing reliance on market incentives while reducing the role of legislation." 1996 N.Y.Laws 639. Defendants' anticompetitive conduct thwarts the State's policy of promoting competition for hospital services. The "active supervision" prong of *Midcal* ensures that immunity will not be granted to private actors whose conduct fails to conform with articulated State interests.

For the reasons stated above, the State's motion for summary judgment as to the unavailability of state-action immunity is granted.

### III. *Per Se Analysis*

 Section One of the Sherman Antitrust Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." 15 U.S.C. § 1. Only those restraints which are unreasonable are actionable. *Northwest Wholesale Stationers,*

*Inc. v. Pacific Stationery and Printing, Co.,* 472 U.S. 284, 289, 105 S.Ct. 2613, 2616, 86 L.Ed.2d 202 (1985). Determination of whether defendants' challenged conduct violates state and federal antitrust laws is guided by Rule of Reason analysis unless the conduct falls into the category of "agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958).[4]

In *Arizona v. Maricopa County Medical Society,* 457 U.S. 332, 343, 102 S.Ct. 2466, 2472–73, 73 L.Ed.2d 48 (1982), the Supreme Court set forth the disadvantages of Rule of Reason analysis:

> The elaborate inquiry into the reasonableness of a challenged business practice entails significant costs. Litigation of the effect or purpose of a practice often is extensive and complex. Judges often lack the expert understanding of industrial market structures and behavior to determine with any confidence a practice's effect on competition. And the result of the process in any given case may provide little certainty or guidance about the legality of a practice in another context.

*Id.* (internal citations omitted).

The activities at issue here, joint negotiations with third-party payers, defendants' allocation of services among themselves and their agreement not to compete for patients, are among those activities the

---

4. The Donnelly Act declares: "Every contract, agreement, arrangement or combination whereby ... [c]ompetition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained ... to be against public policy, illegal and void." N.Y.Gen.Bus.Law § 340(1). The Donnelly Act was modeled on the federal Sherman Act of 1890 and New York courts

have found that state antitrust law "should generally be construed in light of Federal precedent and given a different interpretation only where State policy, differences in the statutory language or the legislative history justify such a result." *People v. Rattenni,* 81 N.Y.2d 166, 597 N.Y.S.2d 280, 613 N.E.2d 155, 158 (1993) (internal citations and quotations omitted).

courts have found to be unlawful in and of themselves.

## A. *Price Fixing*

It has "often been decided and always assumed that uniform price fixing by those controlling in any substantial manner a trade or business in interstate commerce is prohibited by the Sherman Law, despite the reasonableness of the particular prices agreed upon." *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 212–13, 60 S.Ct. 811, 839, 84 L.Ed. 1129 (1940) (internal citations and quotations omitted). However, the per se ban on price fixing is not limited to an express horizontal agreement setting a uniform price for a product or service. Rather, Supreme Court jurisprudence on the subject teaches that the courts must look at the challenged horizontal agreement's practical effect on price and competition.

In *Socony–Vacuum*, the Court found that an agreement among competitors to participate in a program of buying surplus gasoline on the spot market in order to keep prices from falling was illegal despite the fact there was no direct agreement on the actual prices. The Court recognized that "the machinery employed by a combination for price-fixing is immaterial." 310 U.S. at 223, 60 S.Ct. at 844. The Court ruled that prices are "fixed" if "the range within which purchases or sales will be made is agreed upon." 310 U.S. at 222, 60 S.Ct. at 844. Furthermore, the Court decided that the collaborators' market power need not reach the level of "domination and control" for the price-fixing agreement to be actionable. 310 U.S. at 224, 60 S.Ct. at 844. Rather, "[p]roof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under § 1 of the Act." *Id.*, 60 S.Ct. at 844–45.

A ban on discussion of price prior to the selection of a service provider violates the Sherman Act. The Supreme Court found that a professional association of engineers' canon of ethics barring competitive bidding "[o]n its face ... restrains trade within the meaning of § 1 of the Sherman Act." *National Society of Professional Engineers v. United States*, 435 U.S. 679, 693, 98 S.Ct. 1355, 1366, 55 L.Ed.2d 637 (1978). The association's members agreed not to discuss prices with potential customers until after the initial selection of an engineer. The Court found that "[w]hile this is not price fixing as such, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement. It operates as an absolute ban on competitive bidding...." 435 U.S. at 692, 98 S.Ct. at 1366. The Supreme Court followed the district court's finding that "the ban 'impedes the ordinary give and take of the market place,' and substantially deprives the customer of 'the ability to utilize and compare prices in selecting engineering services.'" 435 U.S. at 692–93, 98 S.Ct. at 1366 (internal citation omitted).

The Association asserted that the Rule of Reason applied, claiming that the restraint on competition was necessary to ensure that there were no deceptively low bids that would tempt engineers to do inferior work which in turn could place the public at risk. 435 U.S. at 693–94, 98 S.Ct. at 1366. The Court found that "[e]xceptions to the Sherman Act for potentially dangerous goods and services would be tantamount to a repeal of the statute," 435 U.S. at 695, 98 S.Ct. at 1367, and concluded that "the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." 435 U.S. at 696, 98 S.Ct. at 1368.

The Supreme Court has ruled repeatedly that price fixing does not have to be direct in order to be actionable. In *Catalano v. Target Sales, Inc.*, 446 U.S. 643, 100 S.Ct. 1925, 64 L.Ed.2d 580 (1980), the Supreme Court concluded that beer wholesalers who conspired to eliminate short-term credit to retailers violated Section One of the Sherman Act. Prior to making this agreement, the wholesalers extended

trade credit, interest-free, up to the legal limits of 30 and 42 days. 446 U.S. at 644, 100 S.Ct. at 1926. The wholesalers competed with respect to trade credit and the credit terms for individual retailers varied. 446 U.S. at 645, 100 S.Ct. at 1926. The Court found it "virtually self-evident that extending interest-free credit for a period of time is equivalent to giving a discount equal to the value of the use of the purchase price for that period of time." 446 U.S. at 648, 100 S.Ct. at 1928. Conversely, the Court found that the decision to stop extending interest-free credit amounted to "an agreement to eliminate discounts." *Id.* This agreement, ruled the Court, fell "squarely within the traditional per se rule against price fixing." *Id.*

The wholesalers had argued that giving variable discounts could ultimately lead to a decrease in the invoice price of the beer in a competitive market. The Court found it possible, but "surely not necessarily to be anticipated." *Id.* at 649, 100 S.Ct. at 1928. Instead, the Court stated, "[i]t is more realistic to view an agreement to eliminate credit sales as extinguishing one form of competition among the sellers." *Id.*

In *Maricopa*, the defendants were competing physicians who agreed to set maximum fees that they could claim in full payment for services rendered to subscribers of certain insurance plans. *See* 457 U.S. at 335–36, 102 S.Ct. at 2468. The physicians were organized under a nonprofit foundation established to offer a competitive alternative to existing healthcare plans. 457 U.S. at 339, 102 S.Ct. at 2470. The amount of money the member physicians could recover for services for patients insured under plans approved by the foundation was limited by the fee schedules, although member physicians could charge higher fees to uninsured patients and lower fees to any patient. 457 U.S. at 341, 102 S.Ct. at 2471. The Su-

preme Court, unpersuaded by the defendants' arguments that the agreements were among members of a profession and that the judiciary has little antitrust experience in the healthcare industry, ruled that the maximum fee schedules were per se illegal. *See* 457 U.S. at 348–49, 102 S.Ct. at 2475–76.

■ In the case at bar, defendants have fixed prices by jointly agreeing on the terms and rates they will charge for many of the services they provide.[5] Defendants appointed Marianne Muise to negotiate on their behalf starting in 1997, the first year that New York State law allowed hospitals to negotiate such contracts. (*See* Pl.Rule 56.1 Stmt., Ex. 6 at 121–24.) The fact defendants' contract terms are negotiated with insurers rather than set unilaterally does not save defendants from per se liability. The Supreme Court has found that "[a]ny combination which tampers with price structures is engaged in an unlawful activity." *Socony–Vacuum*, 310 U.S. at 221, 60 S.Ct. at 843. In *Socony–Vacuum*, the Court found that the defendants, who were purchasing surplus oil on the spot market, "were in no position to control the market." *Id.* Nonetheless, the Court ruled that "the fact that sales on the spot markets were still governed by some competition is of no consequence. For it is indisputable that competition was restricted through the removal by respondents of a part of the supply which but for the buying programs would have been a factor in determining the going prices on those markets." 310 U.S. at 220, 60 S.Ct. at 842–43.

Here, defendants have even greater capacity to exert their influence over price than the *Socony–Vacuum* defendants did. Defendants are the only hospitals in Poughkeepsie. Pursuant to their joint negotiating strategy, defendants essentially have an opportunity to unilaterally deter-

---

5. Marianne Muise, defendants' lead negotiator with third-party payers, states in her deposition that behavioral health services at St. Francis were not always the subject of joint negotiations and that services offered at

Vassar Brothers and proscribed by the Catholic Church such as sterilization procedures and abortions were also exempt from joint negotiations. (*See* Pl.Rule 56.1 Stmt., Ex. 6 at 135–39.)

mine a range of prices acceptable to them, much like the maximum fee schedules established by the *Maricopa* defendants. By using Mid–Hudson as their common and exclusive agent to negotiate with insurers, defendants have prevented determination of the rates and terms of the services they provide by free competition alone. Defendants concede as much. Defendants' chief negotiator, Marianne Muise, admits in her deposition that from the time Mid–Hudson was established, competition between defendants for the business of third-party payers was eliminated:

> Q: So from the beginning of Mid Hudson, there was no competition between the hospitals for the business of third-party payers?
>
> A: I don't believe so, no.

(Pl.Rule 56.1 Stmt., Ex. 6 at 107.)

This joint negotiating strategy continues despite protests from insurers. According to David Kadish, vice president of contracts for Mohawk Valley Physician's Health Plan, Inc. ("MVP"), MVP does not want to continue negotiating jointly with defendants for fear joint negotiations "will only result in MVP and its members being forced to pay more for services." (Kadish Aff. ¶ 32.) Director of Upstate Contracting Network Development for Empire Blue Cross/Blue Shield ("Empire") Barry Brandow states that despite requests to defendants to negotiate on an individual basis, defendants have refused to do so. Brandow states that Empire ultimately conducted joint negotiations with defendants "under protest." (Brandow Aff. ¶ 28.)

Defendants urge that Rule of Reason analysis is appropriate because their collaboration has created "efficiencies and benefits." However, none of the proffered efficiencies relate to the joint negotiations themselves. Defendants highlight: the reduction of duplication of services; elimination of competition for equipment and personnel; the ability to offer services in Poughkeepsie that defendants allege could not otherwise exist; cost savings through joint purchasing; joint professional training and public education; and standardized protocols. (*See* Defs.Mem.Opp.Summ.J. at 10–11.) Many of these "efficiencies" are tantamount to the elimination of free competition. For example, eliminating the duplication of services is simply another way of stating that defendants have allocated the market for services among themselves. Their argument rests on the impermissible premise "that competition itself is unreasonable." *National Society of Professional Engineers*, 435 U.S. at 696, 98 S.Ct. at 1368. The Supreme Court has stated:

> The assumption that competition is the best method of allocating resources in a free market recognizes that all elements of a bargain—quality, service, safety, and durability—and not just the immediate cost, are favorably affected by the free opportunity to select among alternative offers. Even assuming occasional exceptions to the presumed consequences of competition, the statutory policy precludes inquiry into the question whether competition is good or bad.

*Id.* at 695, 98 S.Ct. at 1367. *See also Socony–Vacuum*, 310 U.S. at 221–22, 60 S.Ct. at 843 ("Congress has not left us with the determination of whether or not particular price-fixing schemes are wise or unwise, healthy or destructive. It has not permitted the age-old cry of ruinous competition and competitive evils to be a defense to price-fixing conspiracies.").

For the reasons stated above, the State's motion for summary judgment as to per se liability with respect to defendants' joint negotiations with third-party payers is granted.

**B. *Market Allocation Activity***

█ Like price fixing, a horizontal agreement among competitors to eliminate competition by allocating markets is a per se violation of Section One of the Sherman Act. *United States v. Topco*, 405 U.S. 596, 608, 92 S.Ct. 1126, 1133, 31 L.Ed.2d 515 (1972). The Supreme Court "has reiterated time and again that 'horizontal territori-

al limitations ... are naked restraints of trade with no purpose except stifling of competition.'" *Id.*, 92 S.Ct. at 1133–34 (citation omitted). "Such agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely reserve one market for one and another for the other." *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49–50, 111 S.Ct. 401, 403, 112 L.Ed.2d 349 (1990). Market division of products is actionable, *see Burke v. Ford*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967), as are restraints on customers. *Topco*, 405 U.S. at 612, 92 S.Ct. at 1136; *Rattenni*, 597 N.Y.S.2d 280, 613 N.E.2d at 155. These restraints "so often prove so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 119 S.Ct. 493, 497, 142 L.Ed.2d 510 (1998).

■ Here, defendants have engaged in an ongoing horizontal arrangement to divide the market for healthcare services in Poughkeepsie. In the early to mid–1990s, defendants set up a system they called the "trades" pursuant to which specified services were allocated to one hospital or the other. Defendants agreed not to compete for customers for these services. As previously stated, Vassar was designated as the site for the cardiac catheterization laboratory and the cardiology center; obstetrics; the predominant site for gynecology; cancer admissions dependent on high technology; fifty percent of general surgery; and the medical pediatrics unit. St. Francis was designated for selected cancer admissions not dependent upon high technology; orthopedics/neurology; MRI; mobile lithotripsy; the predominant site for ambulatory surgery and the laser center; the predominant diagnostic outpatient center; plastic surgery; fifty-percent of general surgery; an expanded emergency room, trauma II; and a guaranteed percentage of the market share of medical admissions.

As also stated above, defendants implemented a "Fairness Formula" to ensure that defendants' market share would remain at 1991 levels. Pursuant to the "Fairness Formula" defendants agreed to allocate customers by asking physicians with joint privileges to redirect patients from the "advantaged" hospital to the "disadvantaged" hospital to roughly maintain the 1991 base market share. However, this plan was ineffective due to the fact medical admission frequently go through the emergency room, which means the choice of hospital was the patient's, and not the treating physician's.

Defendants' agreement to allocate patients among themselves and divide the market for hospital services is the paradigm of the horizontal market division that the Supreme Court has deemed per se illegal. Defendants argue that "the cooperation between the hospitals has brought to the Mid–Hudson Valley high technology, tertiary, health care services, which otherwise would not have been available without their cooperation.... Without [Mid–Hudson], such services would not have been available at either the Vassar or the St. Francis campuses and there would have been one less provider of such tertiary care services with which managed care companies would be able to negotiate rates for their enrollees." (Defs.Mem.Opp.Summ.J. at 14.) This may be the case. However, this Court is constrained by Supreme Court precedent which unequivocally applies per se treatment to horizontal market allocations in the absence of a determination that the restraints were necessary to make the product available at all.[6] Certainly defendants may have achieved a level of expertise and technology through their collaborative efforts that would have been difficult to attain absent cooperation. However, as the Supreme Court stated in *Topco*, "[w]hether or not we would decide this case the same way under the rule of reason ... is irrelevant to the issue be-

6. As will be discussed *infra* in Part III.C., such is not the case here.

fore us." 405 U.S. at 609, 92 S.Ct. at 1133. There, the Court stated:

> The fact is that the courts are of limited utility in examining difficult economic problems. Our inability to weigh, in any meaningful sense, destruction of competition in one sector of the economy against promotion of competition in another sector is one important reason we have formulated per se rules.
>
> In applying these rigid rules, the Court has consistently rejected the notion that naked restraints of trade are to be tolerated because they are allegedly developed to increase competition.

405 U.S. at 609–610, 92 S.Ct. at 1134–35 (footnote omitted).

Tolerance for horizontal market divisions is even further decreased where, as here, that restraint is accompanied by price fixing. In *United States v. Sealy, Inc.*, the defendant argued that territorial divisions by manufacturers licensed to produce Sealy mattresses and bedding products were incidental to a lawful program of trademark licensing. 388 U.S. 350, 356, 87 S.Ct. 1847, 1852, 18 L.Ed.2d 1238 (1967). However, the Court ruled that the territorial restraint's "connection with the unlawful price-fixing is enough to require that it be condemned as an unlawful restraint. . . ." 388 U.S. at 356–57, 87 S.Ct. at 1852. Here, defendants' allocation of the market for health care services and their joint negotiation strategy are symbiotic, elements of an overall plan that, regardless of its potential benefits, fits squarely into that category of activities whose "anticompetitive nature and effect are so apparent and so serious that the courts will not pause to assess them in light of the rule of reason." 388 U.S. at 355, 87 S.Ct. at 1851.

For the reasons stated above, the State's motion for summary judgment with regard to per se liability for defendants' market allocation activities is granted.

## C. *Defendants' Arguments Against Per Se Treatment*

Defendants argue that Mid–Hudson and its member hospitals represent a unique entity and that Rule of Reason analysis applies to their activities for the following reasons: (1) Mid–Hudson is a joint venture; (2) the state was involved in the creation of Mid–Hudson; (3) the challenged restraints are ancillary to a legitimate business transaction; (4) the judiciary has no experience with an entity such as Mid–Hudson; (5) defendants are non-profit organizations; (6) the U.S. Department of Justice and the State reviewed plans for a "virtual merger" of defendants in 1995 and did not object to it; (7) the community supports defendants' plan; and (8) the complaining managed care companies are guilty of "inequitable conduct". (Defs.Mem.Supp.Summ.J. at 12–23.) We find each of these arguments unavailing.

First, as a matter of law, joint ventures have no immunity from the antitrust laws. *National Collegiate Athletic Ass'n v. Board of Regents of the University of Oklahoma,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) ("*NCAA*"). Cases in which joint ventures whose anticompetitive activities otherwise would have been subjected to per se treatment but were reviewed under the Rule of Reason are those in which "horizontal restraints on competition are essential if the product is to be available at all." 468 U.S. at 101, 104 S.Ct. at 2960. Thus, in *NCAA,* the Supreme Court recognized: "What the NCAA and its member institutions market in this case is competition itself—contests between competing institutions. Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed." *Id.* In an earlier decision, *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* 441 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979), the Supreme Court ruled that a blanket license fee for use of copyrighted musical compositions set by agencies was not per se illegal as it "accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use." 441 U.S. at 20, 99 S.Ct. at 1562.

The Court found that the blanket license, which took the place of individual bargaining with copyright holders, was "to some extent, a different product." 441 U.S. at 22, 99 S.Ct. at 1563.

█ Here, the provision of hospital services is not dependent upon restraints on competition as in league sports, nor can it be said that defendants have created essentially a new product. Restraining competition is not a necessary condition of the provision of health care services. The hospitals argue that market and customer allocation and joint negotiations have allowed the hospitals to provide services at "an ever increasing level of expertise and specialization" and in a more cost-effective manner. (Defs.Mem.Supp.Summ.J. at 16.) However, claims of improved quality of service do not shield price-fixing and market allocation activities from per se treatment. *See Maricopa,* 457 U.S. at 351, 102 S.Ct. at 2476–77 (1982) (finding that "[t]hose claims of enhanced competition are so unlikely to prove significant in any particular case that we adhere to the rule of law that is justified in its general application."). In this case, the claimed procompetitive benefits of defendants' activities relate to the Poughkeepsie hospitals' provision of a full panoply of services to allow them to compete with other hospitals in the region. However, their activities clearly limit choice for local consumers who desire health care close to home and their joint negotiations with third-party payers are likely to ultimately result in increased prices to some of these consumers.

█ Defendants' argument that state involvement in the establishment of Mid–Hudson warrants Rule of Reason treatment is also unpersuasive. Defendants point to *Hertz Corp. v. City of New York,* 1 F.3d 121 (2d Cir.1993), *cert. denied,* 510 U.S. 1111, 114 S.Ct. 1054, 127 L.Ed.2d 375 (1994), *and cert. denied,* 510 U.S. 1111, 114 S.Ct. 1055, 127 L.Ed.2d 375 (1994) and *Westchester Radiological Associates P.C. v. Empire Blue Cross and Blue Shield, Inc.,* 707 F.Supp. 708 (S.D.N.Y.1989) to support their contention. However, both of these cases are distinguishable from the one at bar and lend little support to defendants' argument that the Rule of Reason applies here.

In *Hertz,* the defendant was a municipality that had passed a local law in response to the Hertz car rental company's proposed surcharges on cars rented to residents of New York City. 1 F.3d at 124. The court found that the City passed the law pursuant to its home-rule authority, not pursuant to a "clearly-articulated state policy." *Id.* at 128. The court did not find that per se analysis was inappropriate because of state involvement. Rather, the court was persuaded to use the Rule of Reason because: the courts have had little experience with efforts by local governments to restrain trade; the City claimed that the law promoted the non-economic objective of anti-discrimination; the case could not "be easily grouped with previous [per se] cases"; and the Supreme Court has cautioned that per se analysis may not be appropriate for assessing municipal antitrust liability. *Id.* at 129.

In *Westchester Radiological Associates,* the plaintiffs were hospital-based radiologists who complained that the defendant, an insurance company, violated the antitrust laws by requiring some hospitals with which they contracted to offer radiology services as part of a package of hospital services. *See* 707 F.Supp. at 710. The plaintiffs wanted to bill patients directly for their services. *See id.* The court found that the defendant's activities were not clearly anticompetitive, as "[t]he agreements permit a sophisticated buyer, Blue Cross, to monitor and predict charges, and permit it to offer cost containment as a service to its less sophisticated, individual subscribers." *Id.* at 710. In contrast, defendants in this action are using their combined market power to force third-party payers to negotiate with defendants jointly, which eliminates competition between defendants and is likely to result in higher fees for services rather

than cost containment. *See New York Citizens Committee on Cable TV v. Manhattan Cable TV, Inc.*, 651 F.Supp. 802, 811 (S.D.N.Y.1986) ("basic economics dictates that the existence of only one seller in a given market would lead to higher prices charged to the buyer in that market."). In addition, *Westchester Radiological Associates* was decided prior to health care reform when the State itself set the rates that the defendant insurer could pay the hospitals with which it contracted. *See id.* at 714. As discussed above, the State has since decided to replace regulation with competition in the health care services market and a decision in this case that state action merits Rule of Reason analysis would undercut that State policy.

■ Defendants' argument that the challenged restraints are ancillary to an otherwise legitimate business endeavor is similarly unavailing. Defendants claim that "[t]he challenged restraints ... have contributed to the success of [Mid–Hudson] by making possible new and enhanced services and a formula for sharing revenue from these services." (Defs.Mem.Supp.Summ.J. at 18–19.) As stated above, the new services could be offered independently of the challenged restraints. Defendants' argument boils down to an assertion that competition would result in financial hardship on defendants. The Supreme Court has found that "the Rule of Reason does not support a defense based on the assumption that competition itself is unreasonable." *National Society of Professional Engineers*, 435 U.S. at 696, 98 S.Ct. at 1368.

■ Defendants also claim that this Court should apply the Rule of Reason to their activities because of a lack of judicial experience with the industry. Certainly an Article 28 hospital without a physical plant or medical staff of its own is a novel creation. However, the courts have had substantial experience with the type of restraints challenged here. The fact these restraints arose in the context of a new form of Article 28 hospital does not alter the analysis. In *Maricopa*, the Supreme

Court was "unpersuaded by the argument that we should not apply the per se rule in this case because the judiciary has little experience in the health care industry." 457 U.S. at 349, 102 S.Ct. at 2475. The Court reiterated the finding in *Socony–Vacuum* that "[w]hatever may be its peculiar problems and characteristics, the Sherman Act, in so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." * *Id.*, 102 S.Ct. at 2476 (citing *Socony–Vacuum*, 310 U.S. at 222, 60 S.Ct. at 843; *see also Topco*, 405 U.S. at 608, 92 S.Ct. at 1133) ("One of the classic examples of a per se violation of § 1 is an agreement between competitors at the same level of the market structure to allocate territories in order to minimize competition.")

■ Defendants also point to their non-profit status to support their position. However, the Supreme Court has made it clear that the antitrust laws are applicable to non-profit organizations. *See, e.g., NCAA*, 468 U.S. at 101, 104 S.Ct. at 2960 (1984); *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 786–87, 95 S.Ct. 2004, 2012–13, 44 L.Ed.2d 572 (1975). Nor is this Court compelled to apply the Rule of Reason because the United States Department of Justice and the State Attorney General's Office reviewed a proposed "virtual merger" of the two hospitals in 1995 and failed to object. Certainly courts have considered, among many other factors, a favorable review of the challenged activities by antitrust prosecutors in making a determination whether the restraints are anticompetitive. For example, in *Westchester Radiological Associates*, this court noted that the Department of Justice had found that the buying scheme at issue promoted cost containment. 707 F.Supp. at 714. In *NCAA*, Justice White, writing in dissent, pointed out that the Antitrust Division of the Department of Justice had taken the 1951–53 television plans, which were similar to those at issue in the 1980s, "under study" and failed to object to them

until that lawsuit was initiated. 468 U.S. at 125, 104 S.Ct. at 2973 n. 1 (White, J., dissenting). Nonetheless, we hesitate to place too much importance on the failure of prosecutors to object to a plan for a "virtual merger" in 1995 when the State was still pervasively regulating the health care industry. Furthermore, the record is unclear as to why these agencies failed to object, and we will not engage in speculation.

 Finally, defendants claim that community support for defendants' operations and the alleged inequitable conduct of the complaining managed care companies suggest rejection of per se treatment. First, the Supreme Court has made clear that anticompetitive activities such as price fixing cannot be justified by the good intentions of the parties engaged in the scheme. *Socony–Vacuum,* 310 U.S. at 221–22, 60 S.Ct. at 843. "Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." *Id.; see also NCAA,* 468 U.S. at 101, 104 S.Ct. at 2960 n. 23 ("[I]t is . . . well settled that good motives will not validate an otherwise anticompetitive practice."). Although defendants' actions may be applauded by some members of the community, the antitrust laws were written pursuant to a firmly-held belief that free competition ultimately enures to the benefit of consumers. The remedy here may lie with the legislature.

As the Supreme Court stated in *Maricopa:*

> Our adherence to the per se rule is grounded not only on economic prediction, judicial convenience, and business certainty, but also on a recognition of the respective roles of the judiciary and the Congress in regulating the economy. Given its generality, our enforcement of the Sherman Act has required the Court to provide much of its substantive content. By articulating the rules of law with some clarity and by adhering to rules that are justified in their general

application, however, we enhance the legislative prerogative to amend the law.

457 U.S. at 354, 102 S.Ct. at 2478.

The fact the managed care companies who now complain of defendants' conduct owe defendants millions of dollars is irrelevant to the issues here.

For the reasons stated above, we deny defendants' motion for summary judgment, which asks us to rule that their conduct is subject to Rule of Reason analysis. As stated above, the State's motion for summary judgment on the issue of liability is granted.

### IV. *Equitable Estoppel*

Defendants claim that the State is estopped in whole or in part from prosecuting this action. Equitable estoppel is:

> imposed by law in the interest of fairness to prevent the enforcement of rights which would work fraud or injustice upon the person against whom enforcement is sought and who, in justifiable reliance upon the opposing party's words or conduct, has been misled into acting upon the belief that such enforcement would not be sought.

*Readco, Inc. v. Marine Midland Bank,* 81 F.3d 295 (2d Cir.1996) (internal citations omitted).

 Under New York law, the party claiming estoppel must show that the party sought to be estopped: (1) engaged in conduct amounting to a false representation or concealment of material facts; (2) intended such conduct would be acted upon by the other party; and (3) knew the true facts. *Id.* In addition, the party asserting estoppel must show that it: (1) lacked knowledge as to the true facts; (2) relied upon the party it wishes to estop; and (3) made a prejudicial change in its position. *Id.* at 302.

 When a party seeks to estop a governmental entity, the party must also show that a "manifest injustice" will occur if the governmental entity is not estopped. *Liberty Environmental Systems, Inc. v.*

County of Westchester, 1998 WL 799158 at *7 (Nov. 16, 1998 S.D.N.Y.). Estoppel should be applied against the government "with utmost caution and restraint." *Willis v. Department of the Treasury, I.R.S.,* 848 F.Supp. 1127, 1130 (S.D.N.Y.1994) (internal citations and quotations omitted). This is especially true where the government is acting in a sovereign capacity. *Liberty Environmental Systems,* 1998 WL 799158 at *7. At least one New York court has found that the doctrine of equitable estoppel is unavailable against the State where the State is enforcing the antitrust laws. *See State v. New York Movers Tariff Bureau, Inc.,* 48 Misc.2d 225, 231–32, 264 N.Y.S.2d 931 (N.Y.Sup.Ct.1965).

 Defendants have failed to meet the underlying elements of an estoppel defense. Defendants also have failed to make the required showing that a "manifest injustice" would occur if the State is not estopped. The record is devoid of any evidence that would raise a material issue of fact as to whether the DOH made any misrepresentations to defendants on which the DOH intended defendants to rely. Defendants successfully applied for CONs to establish Mid–Hudson and to jointly provide three new services. Defendants further agreed to allocate services among themselves and to jointly negotiate contracts with third-party payers without express approval from the DOH. The failure of the DOH to object to the "trades" and the "Fairness Formula" during the establishment CON process is insufficient as a matter of law to estop the State from seeking to enjoin alleged violations of state and federal antitrust laws and civil penalties under the Donnelly Act in an exercise of its sovereign powers.

## V. *Antitrust Injury*

Defendants claim that the injury alleged here is not actionable. The State alleges:

The defendants' refusal to compete has significantly and adversely impacted New York and its citizens, business, and economy. It has deprived third party purchasers, including managed care companies and the individuals, families, employers, unions and governmental payors who are their members, of the benefits of free and open competition for the purchase of hospital services in Poughkeepsie. Indeed, the refusal to compete has resulted in the Hospitals exacting significantly higher prices for these services than they would be able to in a competitive environment.

(Compl.¶ 2.)

 Section 16 of the Clayton Act states in relevant part that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief ... against threatened loss or damage by a violation of the antitrust laws." 15 U.S.C. § 26. The State, in appropriate circumstances, may sue as *parens patriae* to vindicate its quasi-sovereign rights. *In re Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122 (9th Cir.1973). A state has a quasi-sovereign interest in the economic well-being of its residents. *Alfred L. Snapp & Son, Inc. v. Puerto Rico,* 458 U.S. 592, 602, 102 S.Ct. 3260, 3269, 73 L.Ed.2d 995 (1982).

 The Supreme Court first recognized a state's ability to seek injunctive relief for antitrust injuries on behalf of its citizenry in *Georgia v. Pennsylvania R.R. Co.,* 324 U.S. 439, 450, 65 S.Ct. 716, 722, 89 L.Ed. 1051 (1945). There, the State of Georgia sued twenty railroad companies alleging that the railroads conspired to fix discriminatory rates for freight transportation to and from Georgia. The Supreme Court found that trade barriers "may cause a blight no less serious than the spread of noxious gas over the land or the deposit of sewage in the streams.... These are matters of grave public concern in which Georgia has an interest apart from that of particular individuals who may be affected. Georgia's interest is not remote; it is immediate." 324 U.S. at 450–51, 65 S.Ct. at 723.[7]

---

7. The Court impliedly upheld the continuing validity of *Georgia* in *Hawaii v. Standard Oil* *Co. of Cal.,* 405 U.S. 251, 92 S.Ct. 885, 890, 31 L.Ed.2d 184 (1972).

The Supreme Court has held that a private plaintiff seeking to enjoin anticompetitive conduct pursuant to section 16 must allege "threatened loss or damage of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful." *Cargill v. Monfort of Colorado, Inc.,* 479 U.S. 104, 113, 107 S.Ct. 484, 491, 93 L.Ed.2d 427 (1986) (internal citations and quotations omitted). Defendants argue, based on a Westchester County Supreme Court decision, that the State's claim that managed care companies are paying higher prices for hospital services is insufficient to allege antitrust injury. In *Rubins v. Nine West Group,* No. 0763/99 (N.Y.Sup.Ct. Oct. 29, 1999), the court found that plaintiff's allegations that she and others in the class paid higher prices for shoes than they otherwise would have absent a vertical price fixing conspiracy by defendants fell "far short of the requirement that she allege an actual adverse effect on competition as a whole in the relevant market." *Id.* at 8.

Here, the State has clearly alleged an adverse effect on competition. The State claims that defendants have been able to extract supracompetitive prices for inpatient hospital services by allocating those services between them and by negotiating jointly with third-party payers. Barry Brandow, director of Upstate Contracting Network Development for Empire states in his affidavit that defendants' rates "were at the highest end of the rates negotiated with all hospitals in my region." (Brandow Aff. ¶ 4.) David Kadish, vice president of contracts for MVP, asserts that the rates to which MVP and defendants agreed "are significantly higher, in the aggregate, than most of the hospitals in MVP's entire service area, including many hospitals with higher cost structures and many teaching hospitals, which typically are more complex and service intensive." (Kadish Aff. ¶ 30.) This court has found that antitrust injury is adequately alleged where an association of consumers complains that price increases have resulted from the diminution of competition even where that price increase is not the "direct and immediate result of lack of competition." *New York Citizens Committee on Cable TV v. Manhattan Cable TV, Inc.,* 651 F.Supp. 802, 811–12 (S.D.N.Y.1986).

There is no bright line rule as to the proportion of a state's population that must be affected by the challenged conduct. The Supreme Court has found that "[a]lthough more must be alleged than injury to an identifiable group of individual residents, the indirect effects of the injury must be considered as well in determining whether the State has alleged injury to a sufficiently substantial segment of its population." *Snapp,* 458 U.S. at 607, 102 S.Ct. at 3269. The economic reality is that insurers forced to pay higher rates for health care services are likely to pass the increase to their policy-holders. The Fourth Circuit has found that "[a]llegations of injury to the general economy of the State" in an antitrust suit filed by the state in a parens patriae capacity are sufficient to confer standing on the state attorney general to sue on behalf of the state's citizens for injunctive relief. *Burch v. Goodyear Tire & Rubber Co.,* 554 F.2d 633, 634–35 (4th Cir.1977). Here, the State has gone beyond allegations of general damage to the state economy and demonstrated "threatened loss or damage by a violation of the antitrust laws", 15 U.S.C. § 26, to wit, higher prices for health care services for insurers and their policy-holders.

## VI. *Statute of Limitations*

Defendants also claim that the State's market-allocation claim is barred by the statute of limitations. This assertion is without merit. Defendants claim the applicable statute of limitations is four years for this action. Section 4B of the Clayton Act, 15 U.S.C. § 15b, states in relevant part: "Any action to enforce *any cause of action under 15, 15a, or 15c* of this title shall be forever barred unless commenced within four years after the cause of action accrued." *Id.* (emphasis

added). This claim was brought for injunctive relief pursuant to Section 16 of the Clayton Act. Accordingly, the provisions of Section 4B do not apply here. *See International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp.*, 296 F.Supp. 920, 922 (D.Haw.1969).

## CONCLUSION

The Court is acutely sympathetic with defendants' struggle to survive so that they may continue providing quality medical services to their shared community. As advances in medical science have demanded ever more sophisticated and expensive equipment for diagnosis and treatment, smaller hospitals have found it increasingly difficult to raise funds for the necessary capital investments. Only the largest institutions can provide in-house a full panoply of state-of-the-art services. Unfortunately, St. Francis and Vassar, competing for patients in a limited market, cannot both grow to such size as to allow them to provide duplicative, equipment-intensive services of all types.

Nor can they merge into a single corporate entity. Although such a horizontal merger might escape the proscription of Section 7 of the Clayton Act, 15 U.S.C. § 18, under the "failing company" exception, it is apparently out of the question because it would require consent of the bondholders and because St. Francis could not participate in making available certain procedures which Vassar might wish to perform, including sterilization and abortion.

Recognizing this, the State wisely permitted defendants to provide certain capital-intensive services jointly. However, defendants went beyond that license and divided the market for most health care services between themselves; they even effectively fixed prices for most services provided to health insurers by negotiating jointly with them. These activities are classic examples of per se antitrust violations which the courts have uniformly condemned, despite claims that such cooperation is justified by economic necessity. This Court therefore finds no alternative

under existing law but to declare defendants' aforementioned activities a per se violation of Section 1 of the Sherman Act.

The Court fully realizes that this decision will cause economic hardship to defendants. Competition does that; but it serves what Congress and the State Legislature deem the higher purpose of reducing prices to consumers. There is even a possibility that could ultimately lead to the demise of one of defendants, which ironically would result in the end of local competition and an increase in prices, although some elasticity of demand would be maintained by the availability of medical services in neighboring communities. Perhaps the State will consider such long-term effects of rigid enforcement of the antitrust laws, and allow defendants to share other capital-intensive services so that they may both continue to provide, on a not-for-profit basis, much-needed, high-quality medical care in the Poughkeepsie area.

Until the State does so, this Court must enforce the law as it has uniformly been applied. Although defendants cannot be compelled to provide competing parallel services, the law dictates that they cannot agree not to do so.

Therefore, the Court grants the State's motion for summary judgment on the issue of defendants' liability, concluding that defendants' alleged activities are illegal per se and that defendants are not entitled to state-action immunity. Defendants' motion for summary judgment: (1) that the defendants are entitled to state-action immunity; (2) that defendants' activities are not illegal per se and must be evaluated pursuant to the Rule of Reason; (3) that the State is estopped from bringing this lawsuit; (4) that the State's market-allocation claim is time-barred; and (5) that the State has failed to demonstrate antitrust injury is denied in its entirety.

SO ORDERED.