**HEALTHAMERICA PENNSYLVANIA, INC., et al., Plaintiffs**

**v.**

**SUSQUEHANNA HEALTH SYSTEM, et al., Defendants**

**No. CIV.A.3:CV–00–1525.**

United States District Court, M.D. Pennsylvania.

July 21, 2003.

---

David E. Lehman, McNees, Wallace & Nurick, Harrisburg, PA, Lee Calligaro, Epstein Becker & Green, P.C., Patricia M. Wagner, Epstein, Becker & Green, P.C., Tanya B. Vanderbilt, Epstein Becker & Green, P.C., William G. Kopit, Epstein Becker & Green, P.C., Washington, DC, for HealthAmerica Pennsylvania, Inc., Coventry Health and Life Insurance Company, Coventry Healthcare Management Corporation, Plaintiffs.

Brian M. Peters, Philadelphia, PA, J. David Smith, McCormick Law Firm, Williamsport, PA, John J. Miles, Ober, Kaler, Grimes & Shriver, Washington, DC, Jonathan B. Sprague, Post & Schell, Kathleen Chancler, Post & Schell, Mark L. Mattioli, Post & Schell, P.C., Philadelphia, PA, for Susquehanna Health System, Williamsport Hospital & Medical Center, The, Divine Providence Hospital, Muncy Valley Hospital, Susquehanna Physician Services, Defendants.

## MEMORANDUM

CONNER, District Judge.

This is an antitrust case. Plaintiff, HealthAmerica Pennsylvania, Inc., is a managed care plan that offers a health maintenance organization ("HMO") product in northcentral Pennsylvania. (Doc. 55, ¶ 11). HealthAmerica[1] contends that defendants, Susquehanna Regional Healthcare Alliance d/b/a Susquehanna Health System, Divine Providence Hospital, the Williamsport Hospital & Medical Center, Muncy Valley Hospital, and Susquehanna Physician Services have conspired to fix health care service prices in Lycoming County, Pennsylvania. Defendants assert numerous defenses, including *Noerr–Pennington* immunity, state action immunity, and the *Copperweld* doctrine. This matter is presently before the court in the context of cross motions for summary judgment. For the following reasons, the court will grant defendants' motion for summary judgment.

### I. Factual Background

The following material facts are undisputed.[2]

### General Background

Defendant Williamsport Hospital & Medical Center is a subsidiary of North

---

1. Coventry Health and Life Ins. Co. and Coventry Healthcare Management Corp. are also plaintiffs in this action. Coventry Health and Life Ins. Co. is an insurance company that offers point of service and preferred provider organization products in northcentral Pennsylvania. Coventry Healthcare Management Corp. is a third party administrator operating in northcentral Pennsylvania. All three plaintiffs are wholly owned subsidiaries of Coventry Health Care, Inc. For ease of reference, the court will refer to plaintiffs collectively as "HealthAmerica."

2. *See* Joint Statement of Undisputed Material Facts. (Doc. 117).

Central Pennsylvania Health System. (Doc. 117, ¶ 1). Defendant Muncy Valley Hospital is a subsidiary of Divine Providence Hospital. Defendant Divine Providence Hospital is a subsidiary of the Providence Health System Foundation. *Id.* at ¶¶ 2–3. The Providence Health System Foundation is, in turn, a subsidiary of the Sisters of Christian Charity Health Care Corporation, which is sponsored by a Religious Order, the Sisters of Christian Charity Eastern Province. *Id.* at ¶ 4.

All of the defendant hospitals are located in Lycoming County in northcentral Pennsylvania. *Id.* at ¶ 6. Williamsport Hospital and Divine Providence Hospital are located approximately two miles from each other in Williamsport, Pennsylvania. *Id.* at ¶ 7. There is only one other hospital located in Lycoming County—Jersey Shore Hospital—which in 2001 voluntarily elected to become a critical access hospital. As a result of its election, Jersey Shore is limited to fifteen (15) patients per day. *Id.* at ¶ 8.

On June 22, 1994, the Providence Health System ("PHS") and the North Central Pennsylvania Health System ("NCPHS"), formed Susquehanna Regional Healthcare Alliance ("the Alliance" or "Susquehanna Alliance") d/b/a Susquehanna Health System, a nonprofit organization created to manage the delivery of healthcare services. *Id.* at ¶ 10. PHS and NCPHS are the Alliance's sole corporate members. *Id.* Defendant Susquehanna Physician Services is a subsidiary of Susquehanna Alliance. *Id.* at ¶ 13.

The Board of Directors of Susquehanna Alliance consists of eighteen directors. North Central Pennsylvania Health System nominates and elects nine directors. At least five of those directors must be persons serving on the Board of Directors of Williamsport Hospital. NCPHS retains the power to remove, with or without cause, any Alliance director elected by NCPHS. The Providence Health System nominates and elects nine directors to the board. At least five of those directors must be members of the Board of Directors of either Divine Providence Hospital or Muncy Valley Hospital. PHS retains the power to remove, with or without cause, any Alliance director elected by PHS. *Id.* at ¶ 11. The bylaws of Susquehanna Alliance, state that "[t]he act of a majority of the Directors present in person or by proxy at any meeting at which a quorum is present shall be the act of the Board unless a greater proportion is required by law or by the Articles of Incorporation or by these Bylaws." *Id.* at ¶ 12.

### Pre–Transaction Events

Prior to formation of the Alliance, Williamsport and Divine Providence hospitals were competitors. *Id.* at ¶ 15. At that time, the defendant hospitals offered the same services, with the exception of open heart surgery, available only at the Williamsport Hospital, and radiation oncology and dialysis services, available only at Divine Providence Hospital. *Id.* at ¶ 16.

On March 9, 1994, defendants submitted a presentation describing the proposed formation of Susquehanna Alliance to the Pennsylvania Office of the Attorney General and the United States Department of Justice. *Id.* at ¶ 17.

The presentation stated:

The Alliance will not result in a "merger" or "consolidation" of the hospitals or in an acquisition of assets. *PHS and its sole member, SCCHCC, as well as NCPHS, believe it important for PHS to retain its Catholic identity and mission, which might be lost if the two systems were to consolidate. The Alliance, however, will have responsibility for most economic decisions affecting the hospitals' activities, and the Alli-*

*ance hospitals will compete as one entity.* For antitrust analytical purposes, the Alliances' formation should be examined as an "acquisition."

The Alliance's market share, in any reasonably defined relevant geographic market, will be high. Entry barriers also are high because of certificate-of-need laws . . . . Other factors indicate, however, that on balance, the Alliance's effect on competition will be procompetitive rather than anticompetitive.

*Id.* at ¶¶ 19–20 (emphasis added).

The factors cited included the reconfiguration and consolidation of many services creating efficiencies and reducing costs, passing cost savings on to consumers, the existence of significant competition, and the formation of a business advisory committee. (Doc. 117, ¶ 20). The concluding paragraph of the presentation stated:

The Alliance's efficiencies and service reconfiguration plans clearly would save significant costs; and they would be implemented. The more difficult question is whether those savings would be passed on to purchasers of hospital services—employers and payers. Given the present actual fringe competition, the likely growth of Geisinger, the likely power of both Geisinger and Blue Cross, and the safeguards built into the Alliance through employer input and monitoring, we believe that they will. Those closest to the scene, who have been pressuring the hospitals to integrate for years and are best positioned to answer this question— businesses that will pay the bills— strongly believe so. So

should the Antitrust Division and Pennsylvania Office of Attorney General. *Id.* at ¶ 21.

The Pennsylvania Attorney General's Office filed a complaint on May 24, 1994 challenging the proposed formation of the Susquehanna Alliance. *Commonwealth of Pennsylvania v. Providence Health Systems, Inc., North Central Pennsylvania Health Systems,* Civil Action No. 4:CV–94–772, 1994 WL 374424 (M.D.Pa.1994) (the "1994 Action"). *Id.* at ¶ 24. The Commonwealth of Pennsylvania, PHS and NCPHS immediately entered into a Final Judgment on May 24, 1994 (hereinafter the "Consent Decree") in the 1994 Action. *Id.* at ¶ 26. By express terms of the Consent Decree, the Attorney General authorized the formation of the Susquehanna Alliance in exchange for various conditions and restrictions on the new entity's operations and pricing as set forth below. (Doc. 117, ¶ 28).

### The Alliance Agreement

In June, 1994, approximately one month after entry of the Consent Decree, North Central Pennsylvania Health System and Providence Health System, Inc., together with their affiliates [3], formed the Susquehanna Alliance. *Id.* at ¶ 30. After the June 1994 Alliance Agreement, NCPHS and PHS, and their Affiliates ceased being competitors. *Id.* at ¶ 34. The Alliance Agreement provides that Susquehanna Alliance has

the authority and responsibility for the management and operation of the NCPHS Affiliates and the PHS Affiliates, but not NCPHS or PHS, including

---

**3.** When the Alliance was formed, NCPHS affiliates included the Williamsport Hospital Medical Center and the NCPHS Health Education and Research Foundation ("HERF"). *Id.* at ¶ 32. The Catholic-based PHS affiliates included Divine Providence Hospital, Muncy

Valley Hospital, Grampian Health Services, Inc. ("GHS"), and Grampian Boulevard Corporation. *Id.* at ¶ 33. For ease of reference, the court will refer to all of the affiliates collectively as "Affiliates."

the establishment of overall policy, oversight of the management, long range planning, coordination of managed care plans, and responsibility for programs and services and a unified budget. *Id.* at ¶ 36. The Alliance Agreement further provides that the Boards of Directors of the respective PHS and NCPHS Affiliates retain authority and responsibility for mission and values, governance, credentialing, medical staff issues and quality assurance of the Affiliates. *Id.* at ¶ 37.

The Alliance Agreement contemplates that the parties will share equally in the financial risks and rewards of the joinder. *Id.* at ¶ 38. Each party to the Alliance Agreement retains "its respective separate legal identity and the ownership of all of its assets, real and personal, tangible and intangible, and shall continue to be governed by its respective Board of Directors subject to Section III" of the Alliance Agreement. Section III of the Alliance Agreement relates to consolidation of services, service reconfigurations, and compliance with the Consent Decree. *Id.* at ¶ 40.

An Affiliate must seek approval of Susquehanna Alliance before it acquires, purchases, sells, leases or otherwise transfers any property. *Id.* at ¶ 42. No Affiliate may incur any capital indebtedness unless expressly authorized by the Alliance. *Id.* at ¶ 43. Absent express authorization, NCPHS and PHS may not merge, consolidate, reorganize or enter into any joint venture, management or alliance agreement that would affect autonomy or governance with any entity not a party to the Alliance Agreement. *Id.* at ¶ 44. Under the Alliance Agreement, no party may terminate any program or service or initiate any program or service without the prior approval of the Chief Executive Officer or the Board of Directors of Susquehanna Alliance. *Id.* at ¶ 46.

### The Consent Decree

The Consent Degree has a ten (10) year term which will expire on May 24, 2004. *Id.* at ¶ 47. Through June 30, 1999, the Consent Decree required the defendants to achieve certain savings from increased efficiency and to pass those savings on to consumers or other purchasers of health care services in the form of low-cost or no-cost health care programs for the community or by reducing prices or by limiting actual price increases for the existing services. The five year period during which the defendants were specifically required to pass on efficiencies ended July 1, 1999. *Id.* at ¶ 48.

Defendants complied with the provisions of the Consent Decree regarding the amount of savings to be achieved as well as the amount to be passed on to the community through fiscal year 1999. *Id.* at ¶ 49.[4] The Attorney General determined that as of July 1, 1999, Susquehanna Alliance saved over $105,000,000 and returned $117,000,000 to the community. *Id.* at ¶ 50.

### The Susquehanna Alliance: Post–Transaction Events

On May 2, 1996, NCPHS, PHS and Susquehanna Alliance executed a "Second Amendment" to the Alliance Agreement for the purpose of merging their two physician groups, HERF and GHS, respectively, to become Susquehanna Physician Services. *Id.* at ¶ 65–66. Effective July 1, 1996, Susquehanna Physician Services became a wholly owned subsidiary of Susquehanna Alliance. *Id.* at ¶ 66.

---

**4.** To date, Susquehanna Alliance's case-mix adjusted net inpatient revenue per admission has not exceeded, and has been below, the levels allowed by the Consent Decree. *Id.* at ¶ 62.

From the time of its creation to the present, Susquehanna Physician Services has employed physicians in various specialties, including, but not limited to family practice physicians, pediatricians, psychiatrists, nephrologists and surgeons. *Id.* at ¶ 68. Although Susquehanna Physician Services employs the largest number of primary care physicians in the county, it represents less than a majority of the total number of primary care physicians in Lycoming County. *Id.* at ¶ 69. Susquehanna Physician Services, as an economic entity, does not compete against NCPHS, PHS or any of the Affiliates. *Id.* at ¶ 70. Susquehanna Alliance acts as the purchasing agent for Alliance Affiliates and Susquehanna Physician Services. *Id.* at ¶ 71.

### Management and Operation

As a result of the creation of Susquehanna Alliance, the medical staffs of Divine Providence and Williamsport merged. *Id.* at ¶ 72. With one exception, all inpatient services in the city of Williamsport are now provided at Williamsport Hospital; inpatient services at Divine Providence are limited to psychiatric services. *Id.* at ¶ 73. All medical/surgical inpatient healthcare services are provided at Williamsport Hospital and Muncy Valley Hospital. Emergency Services are provided at Williamsport Hospital. Divine Providence Hospital provides psychiatric services, outpatient surgery, community health services such as dental care, outpatient cancer treatment and renal dialysis. *Id.* at ¶ 74. The Susquehanna Alliance Board of Directors has authorized the consolidation of all inpatient and outpatient services in Williamsport in one facility, with construction anticipated to begin on a single facility between the years 2010 and 2015. *Id.* at ¶ 75.

The Second Amendment to the Alliance Agreement states that "NCPHS and PHS are each responsible for funding an equal share of [Susquehanna Physician Services'] costs." *Id.* at ¶ 76. The reconfiguration of services has resulted in changes in the global budget methodology over time so that not all Susquehanna Physician Services costs are currently shared on a 50–50 basis. *Id.* at ¶ 77. Each individual hospital has its own audited financial statement which is included in the combined audited financial statements for Susquehanna Alliance. *Id.* at ¶ 79. Each hospital must approve the revenues and expenses relating to that hospital as part of the Alliance budgeting process. *Id.* at ¶ 83.

The defendant hospitals share, among other things, one risk manager, one facilities manager, one chief nursing officer, one human resources department, one set of human resources policies, one pension plan, one defined contribution plan, one § 403(b) plan, one vice-president of human resources, one set of administrative policies, one compliance officer, one manager for each separate clinic department, one operating budget, one capital budget, and one health insurance program. Susquehanna Alliance centralizes and performs marketing functions on behalf of all Affiliates. *Id.* at ¶ 80. The Alliance also handles all personnel matters. *Id.* at ¶ 81. Susquehanna Alliance technically employs the staff at each of the Affiliates, including the three hospitals, but the funding for the workers' salaries and pension benefits comes from the individual hospitals. *Id.* at ¶ 82.

The Alliance purchases one medical malpractice, one commercial, one property and one vehicle insurance policy on behalf of the three defendant hospitals. Williamsport Hospital and the Divine Providence/Muncy Valley hospitals have separate bond obligations. *Id.* at ¶ 85. Although not technically obligated under bond covenants to do so, the parties have transferred cash to each other to ensure

that the other is not in default of bond covenants. *Id.* at ¶ 86.

### CPPN

Susquehanna Alliance owns Central Pennsylvania Provider Network ("CPPN"), a network of physicians and hospitals in Central Pennsylvania, established to provide self-insured employers with a comprehensive network. *Id.* at ¶ 90. CPPN contracts with a broad spectrum of independent physicians in Lycoming County, as well as the physicians employed by Susquehanna Physician Services. *Id.* at ¶ 91. The current participating hospitals of CPPN are Divine Providence Hospital, Muncy Valley Hospital, Williamsport Hospital, Evangelical Community Hospital, and Lock Haven Hospital. *Id.* at ¶ 92.

Plaintiffs have never purchased, or attempted to purchase hospital or physician services from CPPN. *Id.* at ¶ 93. CPPN currently contracts only with self-insured employers through self-insured products. *Id.* at ¶ 94.

### Multi–Employer Trusts

West Branch Manufacturing Association ("WBMA") and Williamsport/Lycoming Chamber of Commerce ("WLCC") have contemplated the development of health insurance product. *Id.* at ¶ 96. They hired a consultant to analyze various structures for the product. However, no structure is currently in place. *Id.* WBMA and WLCC have not solicited any offers, nor has Susquehanna Alliance offered, to provide healthcare services under local business health benefit plans on "preferential terms" or otherwise. *Id.* at ¶ 99.

### Hospital Charges and Managed Care Contracting

Susquehanna Alliance sets common charges for all hospitals in the Alliance.

*Id.* at ¶ 101. In 1994 and 1995, the Alliance Board of Directors elected not to increase charges for hospital services. As of July 1, 1996, charges were increased by 4.25%. In 1997, charges were not increased. As of July 1, 1998, charges were increased 6%. As of July 1, 1999, charges were increased 4%. As of July 1, 2000, charges were increased 6%. As of July 1, 2001, charges were increased 5%. *Id.* at ¶ 102.

On April 1, 1995, plaintiffs and Susquehanna Alliance entered into an agreement for provision of Inpatient and Outpatient Surgery Services. Under the contract, Susquehanna Alliance was to be reimbursed at 65% of its in-patient charges and 80% of its out-patient charges. *Id.* at ¶ 104. On August 1, 1997, plaintiffs and Susquehanna Alliance entered a contract which provided that the Alliance was to be reimbursed for outpatient surgery services at a rate of 65% of charges, with a cap of $1,250 per case, as well as other reductions in outpatient charges. *Id.* at ¶ 105. On July 1, 1998, plaintiffs and Susquehanna Alliance entered an agreement which provided that the Alliance would be reimbursed at 60% of charges for inpatient services. *Id.* at ¶ 106.

On August 1, 2000, Susquehanna Alliance and plaintiffs agreed that the Alliance would be reimbursed at 65.5% of charges for inpatient services and 65.5% of charges for outpatient surgery services. The parties also agreed to remove the cap on outpatient surgery. However, the current contract provides for an annual 5% cap on charge increases. *Id.* at ¶ 107. The primary commercial managed care plans in Susquehanna Alliance's service area are Blue Cross, Aetna, HealthAmerica, and Geisinger Health Plan. All of these managed care plans have contracts with the defendants. *Id.* at ¶ 108.

### Plaintiffs' Motion to Designate Additional Uncontested Facts

In addition to the above stipulated facts, plaintiffs filed a motion to designate additional uncontested facts. (*See* Docs. 120–21). After considering the motion and related documents, as well as the record, the court will grant in part and deny in part plaintiff's motion to designate additional facts. The motion will be granted insofar as the court finds that the parties do not contest the following material facts:

The Alliance has not requested that the court terminate the Consent Decree. (Doc 90, ¶ 47).

NCPHS and PHS do not currently fund the Alliance equally, instead "whoever has the cash will fund the amounts that have to be funded."[5] *Id.* at ¶ 85.

The court will deny plaintiffs' motion to designate in all other respects.[6]

### II. Relevant Procedural History

On December 4, 2001, HealthAmerica filed its Second Amended Complaint, which is comprised of six counts. (Doc. 55). In the first count, HealthAmerica contends that defendants' joint negotiation of hospital rates offered to managed care plans constitutes *per se* illegal price fixing in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"). In the second count, plaintiffs allege unlawful interlocks between the boards of directors of the Alliance and its member hospitals, under Section 8 of the Clayton Act, 15 U.S.C.

§ 19 ("Section 8"). In Count III, plaintiffs assert that (i) "joint negotiation of the physician fees of independent physicians by employees of [the Alliance] on behalf of the Central Pennsylvania Provider Network constitutes *per se* illegal price fixing," and (ii) CPPN's refusal to deal with managed care plans except on its own price terms constitutes an unlawful boycott in violation of Section 1. In Count IV, HealthAmerica claims that the Alliance created and operates Susquehanna Physician Services in violation of Section 1. Count V includes an allegation that the Alliance violated Section 1 by requiring HealthAmerica to combine its negotiations of physicians and hospital services fees. Finally, in Count VI, plaintiff contends that "agreements between [the Alliance] and certain employers operating through the West Branch Manufacturers Association and the Williamsport/Lycoming Chamber of Commerce to offer preferential rates to self-insured products sponsored by [the Alliance] violates" Section 1.

The court heard oral argument on the cross-motions for summary judgment on December 17, 2002.[7]

### III. Legal Standard for Summary Judgment

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

---

**5.** The court notes that both of these additional facts are substantially similar to facts contained in the joint statement. (*See* Doc. 117, ¶¶ 61, 77).

**6.** The court will not adopt the balance of the proposed facts because each is either disputed (e.g. HealthAmerica's assertion that the consent decree was not negotiated, and proposed facts 45, 75, 94), lacks support in the record

(e.g. proposed facts 90, 94), or is not material to resolution of the pending motions for summary judgment (e.g. proposed facts 44, 73, 89, 125, 144). *See generally* Doc. 90.

**7.** Counsel for plaintiffs and counsel for defendants are to be commended for their respective oral presentations, which were clear and thorough.

judgment as a matter of law." FED. R. CIV. P. 56(c). *See also Saldana v. Kmart Corp.*, 260 F.3d 228, 231–32 (3d Cir.2001). A fact that will affect the outcome of the case under the governing law is "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether an issue of material fact exists, the court must consider all evidence in the light most favorable to the non-moving party." *Reeder v. Sybron Transition Corp.*, 142 F.R.D. 607, 609 (M.D.Pa.1992) (citing *White v. Westinghouse Electric Company*, 862 F.2d 56, 59 (3d Cir.1988)). *See also Saldana*, 260 F.3d at 232.

At the summary judgment stage, a judge does not weigh the evidence for the truth of the matter, but simply determines "whether there is a genuine issue for trial." *Schnall v. Amboy Nat. Bank*, 279 F.3d 205, 209 (3d Cir.2002) (citing *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

"Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the complaint; instead, it must 'go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, and designate specific facts showing that there is a genuine issue for trial.'" *Schiazza v. Zoning Hearing Bd., Fairview Tp., York County, Pennsylvania*, 168 F.Supp.2d 361, 365 (M.D.Pa. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). *See also Saldana*, 260 F.3d at 232. Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322–323, 106 S.Ct. 2548.

## IV. *Discussion*

### A. *HealthAmerica's Claims Under Section 1 of the Sherman Act*

HealthAmerica alleges various conspiracies and agreements in restraint of trade under Section 1 of the Sherman Act. In pertinent part, Section 1 provides that "every contract, combination ... or conspiracy in restraint of trade or commerce among the several states, or with foreign nations, is declared illegal." 15 U.S.C. § 1.

#### 1. Counts I & V: Internal Alliance Conduct

■ Due to their similarity, Counts I and V will be discussed together. Both Count I and Count V charge defendants with antitrust liability based on conduct wholly internal within the Alliance.

In Count I, plaintiffs' claim that defendants' joint negotiation of hospital rates offered to managed care plans constitutes per se illegal price fixing. (*See* Doc. 55, Count I). Horizontal price fixing occurs when "competitors at the same level agree to fix or control the prices they will charge for their respective goods or services." *U.S. v. Brown Univ. in Providence in State of Rhode Island*, 5 F.3d 658, 670 (3d Cir.1993). The Supreme Court has consistently held price fixing illegal per se under Section 1. *See id.; Citizen Pub. Co. v. U.S.*, 394 U.S. 131, 135, 89 S.Ct. 927, 22 L.Ed.2d 148 (1969).

■ In Count V, plaintiffs allege: The defendants' insistence that physician services offered by the defendants be negotiated through the Susquehanna Regional Healthcare Alliance, that hos-

pital services offered by the defendants be negotiated through that organization, and that hospital services and physician services offered by the defendants be negotiated together through the same organization, constitutes an illegal per se boycott, or other illegal refusal to deal as an unreasonable restraint of trade in the markets for hospital services and the market for physician services in violation of Section 1 . . . .

(Doc. 55, ¶ 80).

Defendants contend that the Alliance and its component parts have integrated to such a degree that they constitute a single entity, legally incapable of conspiring or otherwise engaging in concerted action under *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), and its progeny. HealthAmerica asserts that *Copperweld* is inapplicable because the Alliance is nothing more than a joint operating arrangement created by separate and independent hospital systems. (Doc. 97, pg. 26).

In *Copperweld,* the Supreme Court held that a corporation and its wholly-owned subsidiary constitute a single entity incapable of conspiring for purposes of Section 1. *Id.* at 777, 104 S.Ct. 2731. The *Copperweld* Court recognized that the "Sherman Act contains a 'basic distinction between concerted and independent action,' " *Copperweld,* 467 U.S. at 767, 104 S.Ct. 2731 (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 761, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)), which is necessary to a proper understanding of the terms "contract, combination . . . or conspiracy" in Section 1. *Copperweld,* 467 U.S. at 769, 104 S.Ct. 2731. "[B]ecause it is sometimes difficult to distinguish robust competition from conduct with long-run anti-competitive effects, Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopoli-

zation." *Id.* at 768, 104 S.Ct. 2731. *See also* 15 U.S.C. § 2.

In contrast, concerted action "inherently is fraught with anticompetitive risk. It deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands." *Copperweld,* 467 U.S. at 768–69, 104 S.Ct. 2731. Therefore, concerted action in restraint of trade need not rise to the level of monopoly; Section 1 prohibits *any* level of concerted action in restraint of trade. *See* 15 U.S.C. § 1.

The Supreme Court clarified this dichotomy in the context of a single entity, stating that

it is perfectly plain that an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that [Section] 1 was designed to police. The officers of a single firm are *not separate economic actors pursuing separate economic interests,* so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.

*Id.* at 769, 104 S.Ct. 2731 (emphasis supplied). The Court found that this reasoning applies equally to agreements made between a corporate parent and its wholly owned subsidiary and held that a parent and its subsidiary constitute a single entity for purposes of Section 1 liability. *Id.* at 771, 777, 104 S.Ct. 2731. *See also Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 750 (3d Cir.1996).

Although it explicitly limited its holding to the facts presented (*i.e.* a corporate parent and its wholly owned subsidiary), the *Copperweld* Court stated that "substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1." 467 U.S. at 773 n. 21, 104 S.Ct. 2731 (citing *Sunkist Growers, Inc. v. Winckler & Smith Citrus*

*Products Co.,* 370 U.S. 19, 29, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962)). The Court's rationale included the following:

(1) corporate parents and their wholly owned subsidiaries have "complete unity of interest";

(2) "their objectives are common, not disparate"; and

(3) their actions are "guided or determined not by two separate corporate consciousnesses, but one."

*Copperweld,* 467 U.S. at 771, 104 S.Ct. 2731.

Federal courts have used the *Copperweld* factors and the "substance, not form" mantra to extend *Copperweld* to situations other than that of parents and wholly owned subsidiaries, such as sibling-subsidiaries under the same parent corporation. *See, e.g., Eichorn v. AT & T Corp.,* 248 F.3d 131, 139 (3d Cir.2001). *See also Advanced Health–Care Services v. Radford Community Hospital,* 910 F.2d 139 (4th Cir.1990). Certain courts have applied *Copperweld* to corporations sharing no common corporate ownership whatever. For example, the Ninth Circuit has applied *Copperweld* principles to an arrangement between franchisors and franchisees. *See Williams v. Nevada,* 999 F.2d 445 (9th Cir.1993). The district court in *Williams* concluded:

[f]or two separate corporations to act as a single entity, it is not necessary that one be owned, wholly or in part, by the other corporation. The presence of a parent and subsidiary relationship is not an essential element. The emphasis is properly placed upon the commonality of interest of the corporations and the degree of control exercised by the dominant corporation.

794 F.Supp. at 1032.

In a case decided immediately after *Copperweld,* the Fifth Circuit extended the *Copperweld* doctrine to two corporations which were outwardly unrelated, but commonly controlled. *Century Oil Tool, Inc. v. Production Specialties, Inc.,* 737 F.2d 1316 (5th Cir.1984). In *Century Oil Tool,* three men each owned 30%, 30% and 40%, respectively, of each of the two defendant corporations and each served as officers and directors of both corporations. The Fifth Circuit observed:

When the three joined forces they considered but for tax reasons rejected a formal merger of the two corporations. Given *Copperweld,* we see no relevant difference between a corporation wholly owned by another corporation, two corporations wholly owned by a third corporation or two corporations wholly owned by three persons who together manage all affairs of the two corporations. A contract between them does not join formerly distinct economic units. In reality, they have always had "a unity of purpose or a common design."

*Century Oil Tool,* 737 F.2d at 1317 (citations omitted).

The Third Circuit initially demonstrated reluctance to apply *Copperweld* where 100% ownership did not exist. *Tunis Bros. Co. v. Ford Motor Co.,* 763 F.2d 1482, 1495 n. 20 (3d Cir.1985), *vacated,* 475 U.S. 1105, 106 S.Ct. 1509, 89 L.Ed.2d 909 (1986), *reinstated,* 823 F.2d 49 (3d Cir. 1987), *cert. denied,* 484 U.S. 1060, 108 S.Ct. 1013, 98 L.Ed.2d 979 (1988). However, since *Tunis Bros.,* the Third Circuit has cited with approval cases where other courts have found a lack of capacity to conspire regardless of the corporate structure involved. *See Siegel Transfer,* 54 F.3d 1125, 1133 (3d Cir.1995) (citing *Century Oil Tool, supra* and *Advanced Health–Care, supra* ). The court finds that defendants' corporate structure does not prohibit a finding of single entity status. Therefore, the court will evaluate the

facts of this case, in light of the guidance provided by the Supreme Court, to determine whether defendants constitute a single entity legally incapable of concerted action under *Copperweld*.

The court notes that Count I does not challenge the validity of the defendant hospitals' joinder through the Alliance agreement; it only challenges the subsequent act of joint-pricing. Likewise, Count V only challenges the manner in which the Alliance negotiates contracts. Thus, the threshold inquiry for the court is whether Susquehanna Alliance and the defendant hospitals constitute a single entity legally incapable of conspiring to fix prices for managed care organizations.

Susquehanna Alliance enjoys substantial and significant control over the defendant hospitals. The Alliance has sole authority for the management of the defendant hospitals, including establishment of overall policy, coordination of programs and services and the preparation and implementation of a unified budget. (Doc. 117, ¶ 36). "Susquehanna Alliance's prior approval is needed before any Affiliate acquires, purchases, sells, leases, or otherwise transfers *any* property." *Id.* at ¶ 39 (emphasis supplied). The hospitals cannot "incur any capital indebtedness not previously authorized by Susquehanna Alliance." *Id.* at ¶ 43. In addition, the hospitals have merged their medical staffs and most workers are employees of Susquehanna Alliance. (Doc. 117, ¶¶ 72–74, 81–83). While the hospitals technically have separate bond covenants, they work together to ensure that each meets the requirements of

its own bond covenant. (Doc. 117, ¶¶ 85–88).

In sum, substantial authority is centralized in the Alliance and it is readily apparent that defendants' actions are guided "not by two separate corporate consciousnesses, but one." *Copperweld*, 467 U.S. at 771, 104 S.Ct. 2731. The defendants share common objectives and have complete unity of interests. *Id.*

Although the organizational form employed here is unique,[8] the court finds that the Alliance *functions* as a single entity. Defendants' composition is akin to a corporate parent (Susquehanna Alliance) and its subsidiaries (the hospitals and Affiliates). When defendants act, they "do not suddenly bring together economic power that was previously pursuing divergent goals." *Copperweld*, 467 U.S. at 769, 104 S.Ct. 2731. Indeed, under the Alliance Agreement, the defendant hospitals are helpless to act without the approval of Susquehanna Alliance. Decisions, therefore, are not the product of conspiracy; they are the product of Susquehanna Alliance's exercise of authority.

HealthAmerica relies heavily on the case *New York ex rel. Spitzer v. Saint Francis Hospital*, 94 F.Supp.2d 399 (S.D.N.Y.2000), to support its antitrust claims.[9] While *Saint Francis* appears similar, a closer examination reveals material factual differences between it and the present case. The defendant hospitals in *Saint Francis* operated under a facially similar joinder, but their agreement concerned only certain services within the two hospitals. *See Saint Francis*, 94 F.Supp.2d at 404. The key distinction between the two cases is

---

8. Susquehanna Alliance submits that the defendant hospitals have not fully merged because of Divine Providence's religious affiliation and mission, which the parties seek to preserve. *See* Transcript, pg. 62. (*See also* Doc. 117, ¶¶ 19, 33).

9. It should be noted that the undersigned has no direct family relationship with the Honorable William C. Conner, author of *Spitzer v. Saint Francis Hospital*, 94 F.Supp.2d 399 (S.D.N.Y.2000).

that the hospitals in *Saint Francis* remained independent decisionmakers, while the defendant hospitals in the instant case are controlled by a single decisionmaker, Susquehanna Alliance.

The Alliance is the source from which all major decisions and policies emanate. The defendant hospitals may not buy, sell or lease property without the Alliance's approval. (Doc. 117, ¶¶ 39–42). The Alliance employs all medical staff at each of the defendant hospitals under a centralized system of human resources. (Doc. 117, ¶¶ 72, 81–82). The defendants share, *inter alia:*

> one risk manager, one facilities manager, one chief nursing officer, one human resources department, one set of human resources policies, one pension plan, one defined contribution plan, one § 403(b) plan, one vice-president of human resources, one set of administrative policies, one compliance officer, one manager for each separate clinic department, ... one capital budget, and one health insurance program.

(Doc. 117, ¶ 83). On behalf of all of the hospitals, Susquehanna Alliance purchases a single medical malpractice insurance policy, as well as, "one commercial, one property, and one vehicle insurance policy." (Doc. 117, ¶ 84). This degree of integration was specifically contemplated and authorized by the Commonwealth of Pennsylvania through the Consent Decree. (*See* Doc. 117, ¶¶ 26–29, 36).

Not only did the Susquehanna Alliance hospitals integrate their internal operations, they hold themselves out to the public as a single entity under a centralized marketing arrangement. (Doc. 117, ¶ 80). At some point between 2010 and 2015, the defendants will merge their facilities within a single building and, thus, complete their integration. (Doc. 117, ¶ 75).

In stark contrast to defendants' substantial integration, the New York State Department of Health ("DOH") authorized the *Saint Francis* defendants to merge only three of their numerous services. The *Saint Francis* defendants never actually "unified their operations, created a single parent board, nor merged their medical staffs." *Saint Francis,* 94 F.Supp.2d at 406. Indeed, the defendants in *Saint Francis* never shared a common decisionmaker. Rather, Vassar and St. Francis hospitals, acting through their respective boards of directors, pursued their own interests. For example, Vassar Hospital,

> in conjunction with another hospital, not St. Francis, completed a one million-dollar clinic in Kingston and has entered into a joint venture agreement with Northern Dutchess Community Hospital.

*Id.* at 407. In addition, the *Saint Francis* hospitals never claimed that they constituted a single entity. They argued only that they were engaged in a joint venture subject to rule of reason antitrust analysis. *Id.* at 403, 414. Thus, the *Saint Francis* court did not evaluate the facts under the *Copperweld* doctrine.

The threshold similarity of corporate structures in *Saint Francis* and the present case provides an excellent example of why the Supreme Court found that "substance, not form, should determine whether a separately incorporated entity is capable of conspiring under § 1." *Copperweld,* 467 U.S. at 773 n. 21, 104 S.Ct. 2731. HealthAmerica's reliance on *Saint Francis* is misplaced. Under *Copperweld,* the defendants constitute a single entity incapable of concerted action.

■ HealthAmerica argues, in the alternative, that "*Copperweld* does not immunize the Alliance"; it simply changes the standard of analysis of the Alliance's con-

duct from "per se" to "rule of reason." (Doc. 105, pg. 18). The court disagrees. A finding that *Copperweld* applies is a finding that defendants' conduct is unilateral, not concerted, action. Section 1 simply does not apply to the unilateral conduct of an organization like the Alliance which functions as a single entity. *See id.* at 768, 104 S.Ct. 2731 (stating that Section 1 "does not reach conduct that is 'wholly unilateral.' ") (citations omitted). HealthAmerica could have challenged the creation of the Alliance under Section 1, however, it did not.[10] Defendants are entitled to judgment as a matter of law on Counts I and V.[11]

### 2. Count IV: Conduct Related to Susquehanna Physician Services

█ In Count IV of the Complaint, HealthAmerica claims that the:

transaction that created Susquehanna Physician Services, and the continued operation of that organization, as a subsidiary of the Susquehanna Regional Healthcare Alliance, violates Section 1 of the Sherman Act as per se illegal price fixing in the physician services market, or otherwise violates Section 1 . . . as an unreasonable restraint of trade in the physician services market under a truncated, or full, rule of reason analysis.

(Doc. 55, pg. 24, ¶ 78). Count IV challenges both the joinder of the pre-existing physician organizations and its subsequent conduct. Defendants rely on the *Copperweld* doctrine as a defense to both claims.

Susquehanna Physician Services is a wholly owned subsidiary of Susquehanna

Alliance. Therefore, *Copperweld* is directly applicable to actions taken jointly by Susquehanna Physician Services and Susquehanna Alliance. *See Copperweld,* 467 U.S. at 777, 104 S.Ct. 2731 (holding that a corporate parent and its wholly owned subsidiary are legally incapable of conspiring with one another). To the extent that Count IV implicates actions taken by Susquehanna Physician Services and Susquehanna Alliance jointly, defendants are entitled to judgment as a matter of law.

As stated above, HealthAmerica also challenges the merger of HERF and GHS to form Susquehanna Physician Services. Plaintiffs argue that this merger violates Section 1 because the object of the merger was anticompetitive. This argument is unavailing. At the time of the physician group merger, Susquehanna Alliance, Divine Providence Hospital and Williamsport Hospital constituted a single entity. The physician groups, wholly owned subsidiaries of a single *Copperweld* entity, were non-competing component parts at the time of formal merger. Hence, the Alliance's decision to form Susquehanna Physician Services cannot constitute concerted action under Section 1. *See Copperweld,* 467 U.S. at 777, 104 S.Ct. 2731; *Eichorn,* 248 F.3d at 139.

The court holds that an internal decision by Susquehanna Alliance to restructure the two physician groups under its control does not violate Section 1. *Copperweld,* 467 U.S. at 777, 104 S.Ct. 2731; *Eichorn,* 248 F.3d at 139. Therefore, defendants are entitled to judgment as a matter of law on Count IV.

---

**10.** HealthAmerica did challenge the act of defendants' joinder in the original Complaint (*see* Doc. 1, ¶ 48) and the Amended Complaint (*see* Doc. 13, ¶ 48). However, in the Second Amended Complaint, plaintiffs abandoned the challenge to the "size" or "market power" of the Alliance.

**11.** Because the finding of single entity status is sufficient to preclude Section 1 liability, the court will not discuss *Noerr–Pennington* or state action immunity.

### 3. HealthAmerica's Remaining Section 1 Claims

In Counts III and VI, HealthAmerica alleges two related conspiracies in violation of Section 1, involving Susquehanna Alliance and three organizations external to the Alliance. Plaintiffs assert that

defendants' have agreed to initiate a new insured product in combination with the West Branch Manufacturers Association ("WBMA") and the Lycoming Chamber of Commerce ("Chamber"). That product will utilize both the CPPN physician network, which is engaged in illegal price fixing, and favorable rates provided by the defendants hospitals through CPPN.

(Doc. 105, pg. 24).

According to HealthAmerica, "Counts III and VI are designed to combat defendants' efforts to reduce competition on the merits, and place plaintiffs, and other managed care plans, at a competitive disadvantage." (Doc. 105, pg. 24). Defendants move for summary judgment based on lack of antitrust standing (Counts III and VI) and lack of antitrust injury (Count VI). Although plaintiff argued these claims together, the court will address them separately.

#### a. Count III

In Count III, HealthAmerica makes two distinct claims:

(1) joint negotiation of the physician fees of independent physicians by employees of the Susquehanna Regional Healthcare Alliance on behalf of the Central Pennsylvania Provider Network ("CPPN") constitutes per se illegal price fixing in the physician services market, or otherwise violates Section 1; and

(2) CPPN's refusal to deal with managed care plans except on price terms established by that organization constitutes a per se illegal boycott in the physician services market, or otherwise violates Section 1.

Susquehanna Alliance argues that plaintiffs lack standing to bring an action for antitrust liability on these claims.

■ The requirements for antitrust standing are more demanding than those for constitutional standing, where any injury in fact will suffice. *Gulfstream III Associates, Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir.1993); *Associated Gen. Contractors v. California State Council of Carpenters*, 459 U.S. 519, 535 n. 31, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). To establish antitrust standing, HealthAmerica must show both: "(1) harm of the type the antitrust laws were intended to prevent; and (2) an injury to the plaintiff which flows from that which makes the defendant's acts unlawful." *Gulfstream III*, 995 F.2d at 429 (citing *International Raw Materials, Ltd. v. Stauffer Chem. Co.*, 978 F.2d 1318, 1327–28 (3d Cir.1992)).

■ Plaintiffs' allegations that CPPN and Susquehanna Alliance are engaged in price fixing and conducting a boycott satisfy the first requirement for antitrust standing. *See Brown*, 5 F.3d at 670; *Barry v. St. Paul Fire & Marine Ins. Co.*, 555 F.2d 3, 7 (1st Cir.1977). However, the court must determine whether plaintiffs have shown an injury "which flows from that which makes the [defendants'] acts unlawful." *Gulfstream III*, 995 F.2d at 429. In *Gulfstream III*, the Third Circuit stated that "the second requirement is generally met if the plaintiff is a 'competitor [ ] or a consumer in the relevant market.'" *Id.* at 429 (citations omitted). The second prong is also satisfied if the plaintiff shows a "significant causal connection" that is "inextricably intertwined with the antitrust conspiracy." *Id.* The court

finds that HealthAmerica cannot satisfy this prong of the test.

In support of its claims in Counts III and VI, HealthAmerica submits that "[p]lainly, plaintiffs will be a competitor with the new product as soon as it begins operation." (Doc. 105, pp. 27–28). However, while HealthAmerica may eventually compete with the *"new product" alleged in Count VI,* HealthAmerica does not compete with the *physicians* who are allegedly fixing their fees through CPPN. Therefore, HealthAmerica has not shown any injury flowing from the alleged price fixing and alleged boycott *as a competitor.*

HealthAmerica is also not a consumer of CPPN's services. "Plaintiffs have never purchased, or attempted to purchase any type of hospital or physician service from or through CPPN." (Doc. 117, ¶ 93). CPPN contracts only with self-insured employers. It is offered to employers only through self-insured products, and it does not contract with managed care plans, such as HealthAmerica. (Doc. 117, ¶¶ 94–95). Additionally, CPPN is a non-exclusive provider network and HealthAmerica can freely contract with the individual physicians independent of CPPN. (Doc. 94, pg. 33).

Because plaintiffs never contracted with CPPN and certainly never competed with CPPN, plaintiffs have failed to show an injury which "flows from that which makes defendant's acts unlawful" or a "significant causal connection" that is "inextricably intertwined with the antitrust conspiracy." *Gulfstream III,* 995 F.2d at 429. Therefore, HealthAmerica lacks standing to bring the antitrust claims alleged in Count III and defendants are entitled to judgment as a matter of law on these claims.

### b. Count VI

In Count VI, HealthAmerica alleges:

The agreements between Susquehanna Regional Healthcare Alliance and certain employers operating through the West Branch Manufacturers Association and the Williamsport / Lycoming Chamber of Commerce to disadvantage plaintiffs, and other managed care plans, by offering preferential rates to self-insured products sponsored by the defendants violates (sic) Section 1 of the Sherman Act as an unreasonable restraint of trade in the market for employer health benefits under a truncated, or full, rule of reason analysis.

(Doc. 55, pg. 25). Defendants claim that plaintiffs have not suffered antitrust injury. The court agrees.[12]

■ To prevail on an antitrust claim, the plaintiff must show that their injury "is attributable to an anti-competitive aspect of the practice under scrutiny," because Congress did not intend to "award damages for losses stemming from continued competition." *Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 334, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (quoting *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986)). *See also Mathews v. Lancaster General Hosp.,* 87 F.3d 624, 641 (3d Cir.1996) (holding that under Section 1 plaintiff "must prove 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.' ") (citations omitted).

■ In *Atlantic Richfield,* the plaintiff challenged a vertical maximum price fixing scheme instituted by one of its competitors

---

12. Because it is clear that plaintiffs have not suffered antitrust injury in relation to Count VI, the court will not discuss defendants' additional grounds for summary judgment (lack of antitrust standing and lack of conspiracy).

to increase market share. The plaintiff argued that it suffered antitrust injury when it was forced to lower its prices to remain competitive. The Supreme Court rejected this claim opining that "[a] firm complaining about the harm it suffers from nonpredatory price competition is really claiming that it [is] unable to raise prices .... This is not antitrust injury ...." *Atlantic Richfield,* 495 U.S. at 338, 110 S.Ct. 1884.

The antitrust laws were promulgated to protect competition, not competitors. *Id.; Mathews v. Lancaster General Hosp.,* 87 F.3d 624, 641 (3d Cir.1996). "Low prices benefit consumers regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition." *Atlantic Richfield,* 495 U.S. at 340, 110 S.Ct. 1884. "To hold that the antitrust laws protect competitors from the loss of profits due to [nonpredatory] price competition would, in effect, render illegal any decision by a firm to cut prices in order to increase market share." *Id.* at 338, 110 S.Ct. 1884 (quoting *Cargill,* 479 U.S. at 116, 107 S.Ct. 484).

Based on the uncontested facts in the record, HealthAmerica has not shown injury flowing from any anticompetitive conduct alleged in Count VI. Culled to its essence, Count VI claims that if the Alliance provides preferential rates to WBMA and WLCC, HealthAmerica will be forced to lower its own prices. Although the mechanism for lowering the prices is different in the instant case, plaintiffs present basically the same claim made in *Atlantic Richfield.* According to the undisputed facts, defendants have not actually agreed on any pricing arrangement with WBMA and WLCC. (Doc. 117, ¶¶ 96–99). Moreover, there is no evidence that the Alliance has conspired to set prices so low as to constitute predatory pricing. Indeed, plaintiffs have failed to delineate a claim of predatory pricing, but complain only that the Alliance has offered WBMA and WLCC "preferential rates." (Doc. 55, ¶ 82). Accordingly, plaintiffs have not established antitrust injury and defendants are entitled to judgment as a matter of law on Count VI.

### B. *HealthAmerica's Claims under Section 8 of the Clayton Act*

In Count II, HealthAmerica claims that "interlocks between members of the boards of the defendant hospitals and the Susquehanna Regional Healthcare Alliance violate Section 8 of the Clayton Act." (Doc. 55, pg. 23). Section 8 provides that:

No person shall, at the same time, serve as a director or officer in any two corporations (other than banks, banking associations, and trust companies) that are-

(A) engaged in whole or in part in commerce; and

(B) by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the antitrust laws;

if each of the corporations has capital, surplus, and undivided profits aggregating more than $10,000,000 as adjusted pursuant to paragraph (5) of this subsection.

15 U.S.C. § 19.

In order to implicate Section 8, the organizations with common directors must be competitors. *See Las Vegas Sun. Inc. v. Summa Corp.,* 610 F.2d 614, 618–19 (9th Cir.1979) ("The language of section 8 presumes that the allegedly interlocking corporations are competitors, i.e., presently competing. The evil sought to be avoided is the lessening of that competition. Clearly, where competition does not exist, the statute cannot apply."). As previously

discussed in the court's application of *Copperweld, infra,* the Alliance and its defendant hospitals function as a single entity; they are not competitors. Therefore, defendants are entitled to judgment as a matter of law on Count II.

### V. *Conclusion*

For the foregoing reasons, the court will grant defendants' motion for summary judgment. An appropriate order will issue.

### *ORDER*

AND NOW, this 21st day of July, 2003, in accordance with the accompanying memorandum, it is hereby ORDERED that:

1. Plaintiffs' motion to designate additional facts (Doc. 12) is DENIED in part and GRANTED in part.

2. Defendants' motion for summary judgment (Doc. 87) is GRANTED.

3. Plaintiffs' motion for partial summary judgment (Doc. 89) is DENIED.

4. The Clerk of Court shall enter judgment in favor of defendants and against plaintiffs and shall close this file.